649 S.E.2d 246

The ESTATE OF Alexia Sheree FOUT–ISER, by Maranda L. FOUT–ISER, Fiduciary; Maranda L. Fout–Iser, Individually; and Jeremy T. Iser, Individually, Plaintiffs Below, Appellants

v.

John L. HAHN, M.D.; Thomas Joseph Schmitt, M.D.; Myung–Sup Kim, M.D.; Grant Memorial Hospital; Regional Healthcare Center; Potomac Valley Hospital of W.Va., Inc., a Corporation; and John Doe, Fiduciary of the Estate of Russell Rhee, M.D., Defendants Below, Appellees.

No. 33189.

Supreme Court of Appeals of West Virginia.

Submitted: March 13, 2007.

Decided: May 21, 2007.

Robert P. Fitzsimmons, Esq., Robert J. Fitzsimmons, Esq., Fitzsimmons Law Offices, Wheeling, for the Appellants.

Thomas J. Hurney, Jr., Esq., Matthew A. Nelson, Esq., Jackson & Kelly, PLLC, Charleston, for the Appellees.

MAYNARD, Justice.

In this case, the Circuit Court of Mineral County entered a summary judgment order dismissing a medical malpractice action filed by the Estate of Alexia Sheree Fout–Iser, by Maranda L. Fout–Iser as fiduciary and individually, and Jerry T. Iser, the appellants and plaintiffs below (hereinafter referred to as "the Isers"). The circuit court granted summary judgment to Anita M. Rhee, Administratrix of the Estate of Russell Rhee, appellee and defendant below, (hereinafter referred to as "Dr. Rhee")[1] on the grounds that the Isers failed to produce a medical expert who would testify that Dr. Rhee breached the standard of care and proximately caused the death of Alexia Sheree Fout–Iser. In this appeal, the Isers contend that summary judgment was inappropriate because their medical experts provided opinions on the standard of care and causation. Alternatively, the Isers contend that no expert was needed to prove a breach of the standard of care or causation. After reviewing the facts of the case, the issues presented, and the relevant statutory and case law, we reverse the decision of the circuit court.

## I.

### FACTS

At around 4:20 p.m. on July 30, 1999, Maranda L. Fout–Iser (hereinafter "Maranda") went to the emergency room at Potomac Valley Hospital. At the time, Maranda was approximately eight months pregnant. Maranda complained of abdominal pain, fever, chills, shortness of breath, vomiting, blurred vision, inability to urinate, and diarrhea. At approximately 4:45 p.m., an emergency room physician, Dr. Thomas J. Schmitt, saw Maranda and ordered an abdominal sonogram. Maranda was then taken to the radiology department for the abdominal sonogram. At around 5:22 p.m., an x-ray technician, Marla Niland, began taking ultrasound images. Ms. Niland was able to produce eight ultrasound images.

At around 5:53 p.m. Ms. Niland sent the eight ultrasound images to the home of Dr. Rhee via teleradiology.[2] At the time, Dr. Rhee was the on-call radiologist for the Hospital. After sending the ultrasound images, Ms. Niland called Dr. Rhee at around 6:00 p.m. According to Ms. Niland, Dr. Rhee voiced strong objections during the conversation by shouting profanities with regard to the poor quality of the images. Dr. Rhee also explained to Ms. Niland that more images needed to be taken. Ms. Niland testified that due to Maranda's condition she was seeking direction from Dr. Rhee. She also explained to Dr. Rhee that she needed his assistance because she had only participated in approximately five previous ultrasounds, all or most of which had occurred during her training period.

According to Ms. Niland, she said during her telephone conversation with Dr. Rhee: "Look, I need help here. I've never—I've not seen this before, and I need help, and he said—I said we don't do that many OB ultrasounds, and I've not seen this before, and he told me that it was my job to know what to do." Ms. Niland then said that Dr. Rhee told her that he "didn't have time to come to Keyser to do a f* * *ing ultrasound." She also said that Dr. Rhee told her to contact Vanessa Miller, a certified ultrasound technician, to help her in obtaining adequate images. Ms. Miller, who was not on call on that day, was unable to come to the hospital.

After speaking with Ms. Miller, Ms. Niland proceeded to take fifty additional ultrasound images. At around 6:35 p.m., as Ms. Niland was completing the ultrasound, she received a call from Dr. Rhee. He called the radiology department to find out if Ms. Niland had contacted Ms. Miller. Ms. Niland spoke with

---

**1.** Dr. Russell Rhee was killed in an automobile accident prior to the filing of the lawsuit in this case.

**2.** The term "teleradiology" is defined as a method "used to digitize data from a medium such as

x-ray film or ultrasound and to transmit those data [on a computer] to a remote unit for purposes of medical review and diagnosis." *Dunbar Medical Systems Inc. v. Gammex Inc.,* 216 F.3d 441, 445 (5th Cir.2000).

Dr. Rhee and informed him that a decision had been made to transfer Maranda to another hospital.[3] Even so, Ms. Niland transmitted the ultrasound images to Dr. Rhee. Subsequently, Dr. Rhee issued a report indicating the presence of a live fetus.

At around 7:15 p.m., Valley Medical Transport arrived and took Maranda to Grant Memorial Hospital. After Maranda arrived at Grant Memorial, at about 8:00 p.m., it was determined that she required a C-section. At 9:59 p.m. the baby was delivered, but it had already died as a result of placental abruption.[4]

In July of 2001, the Isers filed the instant medical malpractice action against Dr. Rhee.[5] After a lengthy period of discovery, Dr. Rhee moved for summary judgment. The circuit court conducted hearings on the motion and, on August 30, 2005, issued an order granting Dr. Rhee summary judgment. In doing so, the circuit court found that the Isers failed to produce a medical expert who would testify as to the standard of care and causation. This appeal followed.

## II.

## STANDARD OF REVIEW

■ We have been called upon to determine whether the circuit court correctly granted summary judgment in favor of Dr. Rhee. In Syllabus Point 1 of *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994), this Court held that: "A circuit court's entry of summary judgment is reviewed *de novo.*" We have also held that, "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syllabus Point 3, *Aetna Casualty & Surety Co. v. Federal Ins. Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963).

In Syllabus Point 2 of *Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 459 S.E.2d 329 (1995), this Court explained that,

> Summary judgment is appropriate if, from the totality of the evidence presented, the record could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove.

We also pointed out in *Neary v. Charleston Area Medical Center, Inc.*, 194 W.Va. 329, 334, 460 S.E.2d 464, 469 (1995) that "[w]hen the principles of summary judgment are applied in a medical malpractice case, one of the threshold questions is the existence of expert witnesses opining the alleged negligence." With these principles in mind, we now consider the parties' arguments.

## III.

## DISCUSSION

■ One of the reasons given by the circuit court for granting summary judgment to Dr. Rhee was that the Isers failed to present a medical expert who would testify that Dr. Rhee violated the applicable standard of care.[6] "It is the general rule that in medical malpractice cases negligence or want of professional skill can be proved only by expert witnesses." Syllabus Point 2, *Roberts v. Gale*, 149 W.Va. 166, 139 S.E.2d 272 (1964).

■ Moreover, when a particular defendant's failure to meet the standard of care is at issue in medical malpractice cases, the sufficiency and nature of proof required is governed by West Virginia Code § 55-7B-7(a) (2003), which specifically provides that: "The applicable standard of care and a defendant's failure to meet the standard of care, if at issue, shall be established in med-

---

**3.** The record indicates that Potomac Valley Hospital did not have obstetrical care capabilities.

**4.** It appears that the baby was given the name Alexia Sheree Fout–Iser.

**5.** Other defendants were named in the lawsuit. Some of those defendants settled with the plaintiffs and the others were dismissed outright.

**6.** The Isers contend that because the circuit court's order required them to show that the breach of the standard of care was "the" cause of their injuries, a higher standard was imposed. We find no merit to this argument. Nothing in the circuit court's order suggests that the Isers had to show that the "exclusive" cause of their injuries was Dr. Rhee's purported violation of the standard of care.

ical professional liability cases by the plaintiff by testimony of one or more knowledgeable, competent expert witnesses if required by the court."[7] Once it is established that a particular expert is to be used as a standard of care witness, the trial court must determine the qualifications of that expert witness pursuant to W.Va.Code § 55–7B–3(a)(1) (2003), which provides that a plaintiff in a medical malpractice action must show that: "The health care provider failed to exercise that degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances[.]" Proof of a violation of the standard of care must be "with reasonable medical probability[.]"[8] W.Va.Code § 55–7B–7(a)(2).

■ The Isers designated Dr. Jeffrey Dicke as their expert on the standard of care. Dr. Dicke's deposition was taken twice. During the first deposition on November 4, 2004, Dr. Dicke was unable to testify that Dr. Rhee had breached the standard of care. At that point in time, however, the whereabouts of Ms. Niland, whose testimony was critical in the evaluation of the conduct of Dr. Rhee, were unknown to the Isers. The Isers had requested numerous times to take Ms. Niland's deposition; however, Potomac Valley Hospital stated that she no longer worked at the hospital and that she could not be located. It was not until completion of most, if not all, of the discovery and shortly before the scheduled trial, that counsel for Potomac Valley Hospital indicated that it had located Ms. Niland. Thereafter, on January 15, 2005, Ms. Niland's deposition occurred.

Following Ms. Niland's deposition, on August 9, 2005, Dr. Dicke was deposed for a second time. During that deposition, in response to questions by counsel for Dr. Rhee, Dr. Dicke stated the following regarding the standard of care:

Q. Okay. So what you have stated thus far is your view, is your opinion, rather, to a reasonable medical probability, that Dr. Rhee, by not doing what you suggested, violated some medical standard of care?

A. Yes.

Q. Well, what is the violation of the standard of care? I'm still not clear.

A. Dr. Rhee, in his capacity as a radiologist, was responsible for providing an interpretation of the images. Per Ms. Niland's testimony, Dr. Rhee was not satisfied with the quality of the images he was receiving. Since he is the one that's responsible for rendering that interpretation, I would consider it his responsibility to provide some additional either guidance or direction by himself or somebody else that would allow him to be comfortable rendering an interpretation of the patient and the images that he received.

We find that Dr. Dicke's testimony regarding Dr. Rhee's deviation in the standard of care was adequate to defeat Dr. Rhee's motion for summary judgment with regard to that issue. While the entire transcript of Dr. Dicke's second deposition is not in the record before us, there is no dispute with regard to the accuracy of the aforementioned quote.[9] It has been quoted verbatim by both parties in countless pleadings before this Court as well as in the circuit court. And, while Dr. Rhee argues that the complete transcript shows that Dr. Dicke testified that Dr. Rhee

---

**7.** This statute was amended subsequent to the filing of the Isers' complaint. However, the changes do not affect the relevant matters in this case.

**8.** The Isers contend that the circuit court imposed a higher standard on their expert than is required by statute. The circuit court's order stated that the Isers' expert "could not say to a reasonable degree of medical certainty" that the standard of care was violated. The Isers point out that the statute requires the expert testify "with reasonable medical probability." We find no merit to this issue. While proof by "medical

certainty" is not required, it is clear from the deposition testimony that the Isers' expert was being questioned as to "medical probability." *See Torrence v. Kusminsky*, 185 W.Va. 734, 746, 408 S.E.2d 684, 696 (1991) (expert erroneously, but harmlessly, being asked to give opinion with medical certainty). We find the circuit court's use of the phrase "medical certainty" to be merely a misnomer.

**9.** At the time the case was argued and submitted for decision, the record on appeal was incomplete. The complete record as designated by the parties was later obtained by this Court.

did not violate the standard of care with regard to some of the specific actions he performed, it is equally clear to us that Dr. Dicke did, in fact, testify that Dr. Rhee violated the standard of care within a reasonable medical probability with regard to some of his actions.

In consideration of all of the above, it is possible that a jury may find from Dr. Dicke's testimony that it was ultimately Dr. Rhee's responsibility to make sure that readable images of Maranda were completed to ensure proper diagnosis and treatment. A jury may also reasonably find that Dr. Rhee was the doctor on call that day, while Ms. Niland was the x-ray technician dealing with a very sick patient. Also, Ms. Niland openly explained to Dr. Rhee her concerns surrounding Maranda as well as making it quite clear to him that she needed immediate assistance. Thus, given all the underlying circumstances it seems reasonable that a jury could conclude that simply instructing Ms. Niland to call another ultrasound technician for assistance was an inadequate response. A jury may further reasonably find that the other x-ray technician was not a doctor, was not on call, and lived a significant distance from the hospital. And, that jury may conclude that even if another x-ray technician would have made it to the hospital that day this would have led to even more delay in treating Maranda, who was eight months pregnant and was vomiting, sweating, experiencing severe abdominal pain, fever, chills, shortness of breath, blurred vision, inability to urinate, and diarrhea.

■ We further find that the circuit court erred by concluding that the Isers failed to present evidence of causation. In that regard, the deposition testimony before the circuit court demonstrated that the delay in treatment of Maranda was significant. This problem is highlighted by the appellants' expert witness, Dr. Richard D. McLaughlin, who offered testimony with regard to causation. Dr. McLaughlin, an obstetrician/gynecologist, in response to questions from counsel for the Isers, testified as follows:

Q. And your second criticism, if you would, please?

A. Would be that the *overall time delay* while she was at Potomac Valley, contributed, in part, by failing to order laboratory tests on a stat or on an emergency basis; *a delay in ultrasound;* and a delay in reporting the presence of this patient to Dr. Hahn, along with the information that had been collected on her.

(Emphasis added). Dr. McLaughlin further testified:

Q. Doctor, in your earlier testimony, you were critical of the time that Mrs. Iser spent in ultrasound. Am I correct?

A. Yes.

Q. Do you have any understanding as to what happened in ultrasound that may have caused any delay?

A. No.

. . . .

Q. Doctor, do you know that the outcome of the fetus would have been any different, in your opinion?

A. Well, the outcome of the fetus as it stands is a dead baby. The baby was alive in your emergency room [Potomac Valley Hospital], and earlier treatment with a rescue C-section could have saved the life of the baby.

Q. Doctor, are you certain within a reasonable degree of medical certainly that the outcome for the fetus would have been different, assuming that the fetus presented as a live, viable fetus?

A. A 32–week fetus has a greater than 90 percent chance of surviving, so yes.

Dr. Rhee maintains that Dr. McLaughlin did not specifically testify that a breach of the standard of care by Dr. Rhee was a cause of the Isers' injuries. He further states that Dr. McLaughlin's testimony surrounded the conduct of other doctors and not Dr. Rhee. It has been recognized by this Court that "[i]n a malpractice case, the plaintiff must not only prove negligence but must also show that such negligence was the proximate cause of the injury." Syllabus Point 4, *Short v. Appalachian OH–9, Inc.*, 203 W.Va. 246, 507 S.E.2d 124 (1998).

In this case, Dr. McLaughlin testified that the delay in transporting caused the death of the baby and injuries. His testimony was

given on May 3, 2004, more than eight months prior to the Isers' locating Ms. Niland. As discussed above, Ms Niland testified that she had experienced significant problems in obtaining proper films and called Dr. Rhee for help. Then, according to Ms. Niland, instead of coming to the hospital to assist her, Dr. Rhee became verbally abusive. While Dr. McLaughlin testified that he did not know the cause of the delay in radiology, he nonetheless clearly testified that the delay was a cause of the death of the baby. Thus, Dr. McLaughlin's testimony, along with Dr. Dicke's testimony that Dr. Rhee violated the standard of care surrounding Maranda's sonogram, are necessarily connected. When read together they constitute evidence that the Isers can present to a jury demonstrating that Dr. Rhee violated the standard of care and that such violation was a cause of the Isers' injury. Conversely, Dr. Rhee's counsel will have equal opportunity to dispute that evidence through cross-examination as well as by presentation of his own expert witnesses during a trial.

In addition, Dr. Schmitt, the emergency room physician that day, testified that the delay in reporting the ultrasound result affected the needed medical action for Maranda. Dr. Schmitt testified that such delay resulted in a violation of the standard of care for getting the results of the sonogram. This is demonstrated by the following excerpt from his testimony:

> Q. And with an abdominal sonogram in a patient like Ms. Iser on July 30, 1999, would the standard of care have been to get those—have the sonogram done by the hospital, sent out and interpreted within approximately 45 minutes?
>
> A. Yes, sir
>
> . . . .
>
> Q. And the results of this appear to have been in excess of two hours; is that correct?
>
> A. Yes.

Q. Before it was conveyed back to you?

A. Yes.

Q. And in excess of an hour and 15 minutes longer than what you consider the standard of care for getting those results back?

A. Yes.

Dr. Schmitt even testified that he called three different times trying to find out why there was a delay in giving him the results of the sonogram.

 This Court has held that "[t]he circuit court's function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter, but is to determine whether there is a genuine issue for trial." Syllabus Point 3, *Painter, supra.* Having reviewed the record in this case, we believe that genuine issues of material fact exist with regard to whether Dr. Rhee violated the applicable standard of care and whether that violation of the standard of care was the cause of injury. As such, the order of the circuit court of Mineral County is reversed, and this case is remanded for further proceedings consistent with this opinion.[10]

## IV.

## CONCLUSION

Accordingly, for the reasons set forth above, the final order of the Circuit Court of Mineral County entered on August 30, 2005, is reversed and this case is remanded for further proceedings consistent with this opinion.

Reversed and Remanded.

DAVIS, C.J., dissenting.

Hard cases make bad law, and the instant case is no exception to this adage. Simply stated, the facts of this case are horrific. The conduct of the physicians who treated Mrs. Fout–Iser and her unborn child was inexcusable, unprofessional, and unquestion-

---

**10.** We summarily reject the Isers' contention that their claim against Dr. Rhee did not require expert testimony. This Court has held that "[a] trial court is vested with discretion under W.Va. Code § 55–7B–7 [2003] to require expert testimony in medical professional liability cases, and absent an abuse of that discretion, a trial court's decision will not be disturbed on appeal." Syllabus Point 8, *McGraw v. St. Joseph's Hosp.,* 200 W.Va. 114, 488 S.E.2d 389 (1997). We do not find that the circuit court abused its discretion by requiring expert testimony in this case.

ably contributed to the death of the Isers' child. Nevertheless, even when a defendant's conduct is egregious beyond words, a plaintiff is not excused from adhering to the requirements of the West Virginia Rules of Civil Procedure when prosecuting a claim. The Rules of Civil Procedure are "administered to secure the just, speedy, and inexpensive determination of every action." W. Va. R. Civ. P. 1. Because the Isers' counsel did not follow the established rules regarding the designation of expert witnesses and because the majority of the Court has excused their failure to so comply as to Dr. Rhee, I respectfully dissent.

In a case seeking to establish medical malpractice, a plaintiff is required to prove two things regarding each defendant: (1) that the defendant's conduct deviated from the applicable standard of care and (2) that such conduct proximately caused the plaintiff's injury. W. Va.Code § 55–7B–3 (1986) [1] (Repl. Vol. 2000) requires, as follows:

> The following are necessary elements of proof that an injury or death resulted from the failure of a health care provider to follow the accepted standard of care:
>
> (a) The health care provider failed to exercise the degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances; and
>
> (b) Such failure was a proximate cause of the injury or death.

*Accord* Syl. pt. 4, *Short v. Appalachian OH–9, Inc.,* 203 W.Va. 246, 507 S.E.2d 124 (1998) ("In a malpractice case, the plaintiff must not only prove negligence but must also show that such negligence was the proximate cause of the injury."). Thus, a plaintiff needs to present evidence regarding the standard of care and causation with respect to each defendant.

Additionally, a plaintiff must establish that a defendant has breached the applicable standard of care and that said breach is a proximate cause of the plaintiff's injury by expert testimony, where required by the court.[2] Specifically, W. Va.Code § 55–7B–7 (1986) (Repl. Vol. 2000) requires, in pertinent part, that "[t]he applicable standard of care and a defendant's failure to meet said standard, if at issue, shall be established in medical professional liability cases by the plaintiff by testimony of one or more knowledgeable, competent expert witnesses if required by the court." We have also addressed the necessity of expert testimony to prove a claim of medical malpractice, and have specifically held that " ' "[i]t is the general rule that in medical malpractice cases negligence or want of professional skill can be proved only by expert witnesses." Syl. Pt. 2, *Roberts v. Gale,* 149 W.Va. 166, 139 S.E.2d 272 (1964).' Syllabus point 1, *Farley v. Meadows,* 185 W.Va. 48, 404 S.E.2d 537 (1991)." Syl. pt. 3, *Farley v. Shook,* 218 W.Va. 680, 629 S.E.2d 739 (2006) (per curiam).

Finally, when a plaintiff intends to call an expert witness to testify at trial, the identity of such expert as well as the subject about which the expert is expected to testify, are discoverable. Rule 26(b)(4)(A)(i) of the West Virginia Rules of Civil Procedure directs that

> [a] party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, *to state the subject matter on which the expert is expected to testify,* and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

(Emphasis added). Furthermore, when a party has disclosed the identity of an expert witness and the subject matter about which the expert is expected to testify, he/she is bound, also, to disclose any new information he/she acquires in this regard. Rule

---

**1.** Because the events giving rise to the instant lawsuit occurred in 1999, I will reference that version of the West Virginia Medical Professional Liability Act that was then in effect, *i.e.,* W. Va.Code § 55–7B–1, *et seq.* (1986) (Repl. Vol. 2000).

**2.** Although counsel for the Isers in this case later disputed that expert testimony was necessary to prove their claims in this case, they did not challenge the trial court's initial determination that experts were needed to prove their claims of malpractice.

26(e)(1)(B) of the West Virginia Rules of Civil Procedure requires that

> (1) [a] party is under a duty seasonably to supplement that party's response with respect to any question directly addressed to:
>
> . . . .
>
> (B) [t]he identity of each person expected to be called as an expert witness at trial, the subject matter on which the expert is expected to testify, and the substance of the expert's testimony.

*Cf.* Syl. pt. 3, *Prager v. Meckling,* 172 W.Va. 785, 310 S.E.2d 852 (1983) ("Rule 26(e)(2) of the Rules of Civil Procedure imposes a continuing obligation to supplement responses previously made when, in light of subsequent information, the original response is incorrect.").

During the proceedings underlying the instant appeal, the trial court, in the course of its July 22, 2003, status conference, specifically required the parties to disclose their expert witnesses to each other. In response thereto, counsel for the Isers served upon the defendants a "Plaintiffs' Designation of Experts and Supplemental Answers to Interrogatories" on November 3, 2003, which they described as providing information about "a. [the] [i]dentity of the expert; b. [the] [s]ubject matter upon which the expert is expected to testify; c. [t]he substance of the opinions to which the expert is expected to testify; and d. [t]he basis for the opinions to which the expert is expected to testify." With respect to Dr. McLaughlin, the plaintiffs provided the following information:

> (1) a. **Richard D. McLaughlin, M.D.,** Medical Arts Center, 1000 East Primrose, Suite 270, Springfield, Missouri, 65807.
>
> b. Obstetrics and gynecology. See attached C.V. which is incorporated herein.
>
> c. It is expected that Dr. McLaughlin will testify whether defendant John L. Hahn, M.D., and/or Hahn Medical Practices, Inc., deviated from acceptable standards of care and/or committed negligence in the overall care and treatment of Maranda Fout–Iser. It is further expected that Dr. McLaughlin will discuss the overall care and treatment of Maranda Fout–Iser as revealed in the medical records of Maranda Fout–Iser which have been provided to defense counsel and all of which are incorporated herein. It is further expected that Dr. McLaughlin will testify whether John L. Hahn, M.D., and/or Hahn Medical Practices, Inc., deviated from acceptable standards of care and/or carelessly and negligently failed to properly diagnosis [sic] and, thereafter, properly manage, and/or treat Maranda Fout–Iser for pre-eclampsia and/or eclampsia and/or placenta abruptio and/or DIC and/or HELLP Syndrome. It is further expected that Dr. McLaughlin will testify on the issues of causation and damages, including permanency and the death of Alexia Cheree Fout–Iser.
>
> d. It is expected that Dr. McLaughlin's opinions will be based upon his knowledge, education, training, and experience, together with his review of the medical records of Maranda Fout–Iser. All medical records are incorporated in this disclosure and have been provided to defense counsel. In addition, Dr. McLaughlin may review the deposition testimony and discovery materials provided by parties to this litigation.

(Emphasis in original).

Consistent with the above-referenced disclosure, Dr. McLaughlin specifically stated at his deposition that his testimony was limited to the conduct of Dr. Hahn and Dr. Schmidt and that he expressly was *not* providing testimony with respect to Dr. Rhee. During his deposition, Dr. McLaughlin testified as follows:

> Q. [by Attorney Goundry (counsel for Dr. Rhee) ] Dr. McLaughlin, this is Ed Goundry. I represent two physicians in this case, Dr. Rhee, who did the radiology ultrasound report, and Dr. Kim, who did the final ultrasound report later. Let me ask you, Doctor—and hopefully, I'll just have this one question. I take it from your testimony that you are not going to be rendering any opinions as to either of those physicians. Is that correct?
>
> A. [by Dr. McLaughlin] You take that correctly.
>
> MR. GOUNDRY: All right. No other questions.

May 3, 2004, Dep. of Richard D. McLaughlin, M.D., at 62–63. No other reference to Dr. Rhee was made in Dr. McLaughlin's deposition.

To summarize, then, in order for the Isers to be permitted to call Dr. McLaughlin to testify that Dr. Rhee had breached the applicable standard of care and that such breach was a proximate cause of their injuries, the Isers first had to either (1) designate Dr. McLaughlin as an expert testifying to these matters, pursuant to Rule 26(b)(4)(A)(i), or (2) supplement their expert disclosure to include such information, in accordance with Rule 26(e)(1)(B). The Isers, however, did neither, and, thus, the circuit court did not err by concluding that they had failed to present evidence as to causation vis-a-vis Dr. Rhee.

In rendering their decision in this case, the majority of the Court completely ignores the failure of the Isers' counsel to designate Dr. McLaughlin as an expert to testify as to standard of care and causation with respect to Dr. Rhee. Rather than recognizing the Isers' failure to comply with the West Virginia Rules of Civil Procedure, the majority instead compounds this error by specifically finding that "the appellants' expert witness, Dr. Richard D. McLaughlin, ... offered testimony with regard to causation." Majority op. at 251. The parties do not dispute that Dr. McLaughlin is qualified to testify as an expert in this case,[3] and, as such, he is perfectly capable of rendering an opinion with regard to causation as it relates to the *other* defendants about whom he has been designated to testify. Dr. McLaughlin could not, however, provide testimony with respect to causation as it related to Dr. Rhee because the Isers neither designated him as an expert in this regard[4] nor supplemented their original expert disclosure list to indicate that Dr. McLaughlin's testimony also would include an evaluation of Dr. Rhee's conduct.

More importantly, though, the record clearly evidences that Dr. McLaughlin did *not* provide testimony regarding Dr. Rhee. Dr. McLaughlin's deposition testimony quite explicitly stated that he would not be testifying as to Dr. Rhee's conduct and whether or not it contributed to the Isers' injuries. In fact, nothing in the record submitted for appellate consideration would lead to the conclusion that Dr. McLaughlin had been designated as an expert to testify regarding Dr. Rhee.

The instant proceeding was appealed to this Court upon the lower court's grant of summary judgment in favor of Dr. Rhee. As such, this Court, when reviewing the lower court's summary judgment order, must view all evidence in the light most favorable to the nonmoving party. *See, e.g.*, Syl. pt. 2, *Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 459 S.E.2d 329 (1995) ("Summary judgment is appropriate if, from the totality of the evidence presented, the record could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that is has the burden to prove."); Syl. pt. 4, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994) (same). *See also Williams*, 194 W.Va. at 59–60, 459 S.E.2d at 336–37 (commenting that when reviewing a motion for summary judgment, "the underlying facts and all inferences are viewed in the light most favorable to the nonmoving party"); *Painter*, 192 W.Va. at 192, 451 S.E.2d at 758 (recognizing that court considering a motion for summary judgment "must draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion" (citations omitted)). In other words, this Court, in reviewing the circuit court's summary judgment order, must construe the evidence presented below in the light most favorable to the Isers.

---

**3.** There is no dispute that Dr. McLaughlin is qualified to testify as an expert in this case with respect to those matters about which he has been designated to testify. His qualifications to testify in that regard are not at issue in this proceeding. *See generally* W. Va. R. Evid. 702 (addressing "[t]estimony by experts"); *Watson v. Inco Alloys Int'l, Inc.*, 209 W.Va. 234, 545 S.E.2d 294 (2001) (discussing qualification of expert witness).

**4.** In fact, the *only* expert the Isers designated in their "Plaintiffs' Designation of Experts and Supplemental Answers to Interrogatories" to provide testimony as to Dr. Rhee was Jeffrey M. Dicke, M.D.

To find in favor of the Isers in this case, the majority determined that the Isers had provided sufficient causation evidence against Dr. Rhee through Dr. McLaughlin's testimony.[5] However, where the Isers failed to amend their witness disclosure list to include Dr. Rhee's conduct as a matter upon which Dr. McLaughlin was expected to testify and where Dr. McLaughlin, himself, clearly stated that he would not testify with respect to Dr. Rhee and did *not* testify regarding Dr. Rhee,[6] I can reach no other conclusion but that Dr. McLaughlin did not establish causation regarding Dr. Rhee. Thus, in the absence of other causation evidence linking Dr. Rhee's conduct to the injuries sustained by the Isers,[7] I respectfully disagree with the majority's decision to the contrary.

5. In support of its ruling in this regard, the majority quotes from that portion of Dr. McLaughlin's deposition in which he provided causation evidence by indicating that delays in Mrs. Fout–Iser's treatment contributed to the Isers' injuries. The context of this testimony, with those portions quoted by the Majority opinion at page 251 appearing in italics, is as follows:

Q. [by Attorney Fields (counsel for Dr. Schmitt)] Dr. McLaughlin, we're back on the record. As I introduced myself earlier, I'm Dan Fields, and I represent Dr. Schmitt in this action.

You characterized your expert designation as incomplete because it did not contain any criticisms of Dr. Schmitt. Have you had those criticisms since you first reviewed all of the material that you referenced earlier?

A. [by Dr. McLaughlin] Yes, sir.

Q. And had you not seen that expert designation before it was published to the parties in this action?

A. Not that I know of.

Q. You do—you weren't asked to add criticisms of Dr. Schmitt to your expert designation. Is that a correct statement?

A. That would be a correct statement.

Q. I want to go back through those in a little bit of—in a little bit of detail and see if we can flesh out—flesh out those criticisms. Would you please, just for the record one more time—I think I have two criticisms of Dr. Schmitt. I don't want this to be criticisms of Potomac Valley Hospital, although, to an extent, that can be somewhat indistinguishable, but just those of Dr. Schmitt, if you would, please.

First criticism is failure to recognize—and I believe this was your term—a catastrophic obstetrical event?

A. Potential catastrophic.

Q. Potential catastrophic. Would you explain that, please?

A. Yes. I think anybody that undertakes the care of a pregnant patient, especially one that is in advanced pregnancy—and 32 weeks would be advanced pregnancy—must realize that these women can get extremely ill for various reasons, one of which is a bleeding problem associated with abruptio placenta. This particular patient really presented with some of the classic symptoms of abruptio placenta, and these were not appreciated by Dr. Schmitt.

Q. And your second criticism, if you would, please?

A. Would be that the overall time delay while she was at Potomac Valley, contributed, in part, by failing to order laboratory tests on a stat or on an emergency basis; a delay in ultrasound; and a delay in reporting the presence of this patient to Dr. Hahn, along with the information that had been collected on her.

May 3, 2004, Dep. of Richard D. McLaughlin, M.D., at 48–50 (emphasis added to highlight deposition testimony quoted by Majority opinion). It is evident, then, that Dr. McLaughlin attributed the delay in obtaining an ultrasound, and the damages resulting therefrom, to Dr. Schmitt, and not to Dr. Rhee.

6. *See supra* note 5.

7. The Isers designated only one expert, Jeffrey M. Dicke, M.D., to provide expert testimony with respect to Dr. Rhee. *See supra* note 4. However, the testimony of Dr. Dicke failed to establish that Dr. Rhee's actions had caused the Isers' injuries. In his deposition of November 4, 2004, Dr. Dicke testified that Dr. Rhee's omission from his teleradiology report of information pertaining to the levels of Mrs. Fout–Iser's amniotic fluid constituted a breach of the standard of care for a radiologist. However, Dr. Dicke could not say that this omission had caused the Isers' injuries:

Q: [by Attorney Goundry (counsel for Dr. Rhee)] But would you agree with me that you cannot say that it would have changed the outcome in this case?

A: [by Dr. Dicke] That's correct.

Nov. 4, 2004, Dep. of Jeffrey Dicke, M.D., at 85. Likewise, Dr. Dicke stated that he did not believe that Dr. Rhee had contributed to the delay in treating Mrs. Fout–Iser:

Q: [by Attorney Goundry] Well, is there anything in the medical records [sic] that Dr. Rhee had anything to do with the what you referred to as the time lapse?

A: [by Dr. Dicke] Not that I saw.

*Id.*, at 54. Furthermore, in a subsequent deposition held on August 9, 2005, Dr. Dicke reiterated his opinion that Dr. Rhee's conduct had not caused the Isers' injuries:

Q. [by Attorney Varner (counsel for the defendants)] Okay. And I assume that you can't say that even if Dr. Rhee had come in when he first was called that it would have made any difference in the outcome of this either?

This Court previously has recognized that "one of the purposes of the discovery process under our Rules of Civil Procedure is to eliminate surprise. Trial by ambush is not contemplated by the Rules of Civil Procedure." *McDougal v. McCammon,* 193 W.Va. 229, 236–37, 455 S.E.2d 788, 795–96 (1995). To this end, this Court also has cautioned that

> [t]he fairness and integrity of the fact-finding process is of great concern to this Court; and, when a party fails to acknowledge the existence of evidence that is favorable or adverse to a requesting party, it impedes that process.... As a general rule, wrongfully secreting relevant discovery materials makes it inequitable for the withholder to retain the benefit of a favorable verdict.

*McDougal,* 193 W.Va. at 238, 455 S.E.2d at 797. When a party, such as in the case *sub judice,* fails to disclose information, or to amend previously disclosed information, that the party is required to disclose, or amend, this Court has found sanctions to be appropriate. *See, e.g.,* Syl. pt. 5, *Prager v. Meckling,* 172 W.Va. 785, 310 S.E.2d 852 ("Factors to be considered in determining whether the failure to supplement discovery requests under Rule 26(e)(2) of the Rules of Civil Procedure should require exclusion of evidence related to the supplementary material include: (1) the prejudice or surprise in fact of the party against whom the evidence is to be admitted; (2) the ability of that party to cure the prejudice; (3) the bad faith or willfulness of the party who failed to supplement discovery requests; and (4) the practical importance of the evidence excluded.").

Most recently, this Court upheld the imposition of such sanctions in *Jenkins v. CSX Transportation, Inc.,* 220 W.Va. 721, 649 S.E.2d 294 (2007) (per curiam), by affirming the trial court's exclusion of the plaintiff's sole evidence on causation. In *Jenkins,* the plaintiff had disclosed his expert witnesses to the defendant and informed the defendant of the matters about which said experts would testify. During the deposition of one of the plaintiff's experts, Dr. Ducatman, the expert was asked whether he had reviewed the neuropsychological test results of a Dr. Phifer. Dr. Ducatman testified that, " 'I do not recall seeing a report from Dr. Pfeiffer [sic] relating to this patient. It does not mean that I haven't seen one.' " *Jenkins,* 220 W.Va. at 724, 649 S.E.2d at 297. At the conclusion of this testimony, counsel for the defendant reserved the right to re-depose Dr. Ducatman if he were to review Dr. Phifer's report. *See* Nov. 19, 2004, Dep. of Alan Ducatman, M.D., at 39. Dr. Ducatman was not re-deposed.

During the trial, however, counsel for the plaintiff called Dr. Ducatman as an expert witness and asked him to testify with respect to his review of Dr. Phifer's report. Because the plaintiff had neglected to supplement his expert disclosure to inform the defendant that the scope of Dr. Ducatman's testimony had changed, and because the defendant had no warning that Dr. Ducatman would be called to testify as to Dr. Phifer's report, the trial court determined that the plaintiff's failure to earlier disclose this information to the defendant precluded him from presenting such evidence at trial. This Court affirmed that ruling. In the instant case, though, the majority, on extraordinarily similar facts, reaches a completely opposite conclusion by not only ruling in favor of the party who failed to disclose the allegedly expanded nature of the expert's testimony[8] but by also

A. [by Dr. Dicke] No.

Aug. 9, 2005, Dep. of Jeffrey Michael Dicke, M.D., at 18. Insofar as the Isers designated only one expert to testify as to causation with respect to Dr. Rhee and that one expert, Dr. Dicke, failed to provide evidence that Dr. Rhee's conduct was a proximate cause of the Isers' injuries, the Isers have not sustained their burden of proof on causation as it relates to Dr. Rhee. *See* W. Va.Code § 55–7B–3 (1986) (Repl. Vol. 2000) ("The following are necessary elements of proof that an injury or death resulted from the failure of a health care provider to follow the accepted standard of care: (a) The health care provider failed to exercise the degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances; *and (b) Such failure was a proximate cause of the injury or death.*" (emphasis added)).

8. I continue to disagree, though, with the majority's conclusion that Dr. McLaughlin's testimony establishes that Dr. Rhee's conduct caused the Isers' injuries insofar as there is no record evidence to suggest that Dr. McLaughlin's testimony

relying upon such non-disclosed testimony to support its decision in that party's favor. I cannot subscribe to this inconsistency.

In conclusion, I wish to make it abundantly clear that I appreciate the very tragic facts of this case, and I emphatically do not condone the utter lack of professionalism inherent therein. Be that as it may, I am nevertheless bound to follow the law of this State, and in accordance therewith I believe that the Isers failed to follow the West Virginia Rules of Civil Procedure by not amending their expert witness disclosure and that the circuit court properly determined that the Isers had not sustained their burden of proof in this case as to Dr. Rhee. Because the majority apparently condones this disregard for the West Virginia Rules of Civil Procedure, I respectfully dissent.

has been expanded to include an assessment of Dr. Rhee.