IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2013 Term

**FILED**

**October 25, 2013**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 12-1069


TERESA DELLINGER, individually and
In her capacity as Executrix of the Estate of
AMBER DELLINGER, deceased,
Plaintiff Below, Petitioner

v.

PEDIATRIX MEDICAL GROUP, P.C.
Defendant Below, Respondent


Appeal from the Circuit Court of Kanawha County
The Honorable Paul Zakaib, Jr.
Civil Action No. 09-C-681

AFFIRMED


Submitted:  October 2, 2013
Filed:  October 25, 2013


John D. Wooton, Esq.                     Tamela J. White, Esq.
Beckley, WV                              Bernard S. Vallejos, Esq.
Attorney for Petitioner                  FARRELL, WHITE & LEGG PLLC
                                         Huntington, WV
                                         Attorneys for Respondent


The Opinion of the Court was delivered PER CURIAM.
JUSTICE KETCHUM, with whom JUSTICE DAVIS joins, dissents and reserves the
right to file a separate opinion.

SYLLABUS BY THE COURT

1.      "This Court reviews *de novo* the denial of a motion for summary judgment, where such a ruling is properly reviewable by this Court."  Syl. Pt. 1, *Findley v. State Farm Mut. Automobile Ins. Co.*, 213 W.Va. 80, 576 S.E.2d 807 (2002).

2.      "Summary judgment is appropriate if, from the totality of the evidence presented, the record could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove."  Syl. Pt. 2, *Williams v. Precision Coil, Inc.*, 194 W. Va. 52, 459 S.E.2d 329 (1995).

3.      "It is the general rule that in medical malpractice cases negligence or want of professional skill can be proved only by expert witnesses."  Syl. Pt. 2, *Roberts v. Gale,* 149 W. Va. 166, 139 S.E.2d 272 (1964).

4.      "In a malpractice case, the plaintiff must not only prove negligence but must also show that such negligence was the proximate cause of the injury."  Syl. Pt. 4, *Short v. Appalachian OH-9, Inc.*, 203 W. Va. 246, 507 S.E.2d 124 (1998).

5.      "Where a physician is testifying as to the causal relation between a given physical condition and the defendant's negligent act, he need only state the matter

i

in terms of a reasonable probability." Syl. Pt. 3, *Hovermale v. Berkeley Springs Moose Lodge No. 1483,* 165 W.Va. 689, 271 S.E.2d 335 (1980).

Per Curiam:

Petitioner/plaintiff below, Teresa Dellinger, individually and in her capacity as Executrix of the Estate of Amber Dellinger, deceased (hereinafter "petitioner"), appeals the Circuit Court of Kanawha County's July 26, 2012, order granting summary judgment in favor of respondent/defendant below, Pediatrix Medical Group, P. C. (hereinafter "respondent"). The circuit court found that petitioner failed to offer evidence sufficient to establish a prima facie case of medical professional liability under West Virginia Code § 55-7B-3 (2003). In particular, the circuit court found that 1) petitioner's expert effectively conceded that he could point to no evidence establishing that Pediatrix's employee, Dr. Manuel Caceres (hereinafter "Dr. Caceres"), breached the standard of care; and 2) petitioner's expert could not state to a reasonable degree of medical probability that any alleged acts of Dr. Caceres proximately caused petitioner's decedent's death. Upon careful review of the briefs, the appendix record, the arguments of the parties, and the applicable legal authority, we agree that petitioner failed to produce sufficient evidence to preclude entry of summary judgment and we therefore affirm the circuit court's entry of summary judgment on behalf of respondent.

## I. FACTS AND PROCEDURAL HISTORY

On September 18, 2007, petitioner took her daughter, Amber, age six, to Raleigh General Hospital with complaints of headache and fever for several days, along with several scattered bug bites on her body. She was treated and released. Her symptoms worsened and she returned to the hospital the following day with nosebleed,

1

vomiting, abdominal pain and backache, whereupon she was admitted. Her condition worsened and on September 21, 2007, she was transferred to Charleston Area Medical Center (hereinafter "CAMC"). Laboratory tests confirmed that she was suffering from La Crosse encephalitis.[1]

At or around 2:15 a.m. on September 23, Amber complained of pain at the site of the IV in her arm. A CAMC nurse took Amber to a "treatment room" and made multiple attempts to start a new IV; during this process, Amber became agitated, began having seizures and lost consciousness.[2] At 2:30 a.m., Dr. Anita Hawks-Henley, a CAMC pediatric resident physician, called Dr. Caceres, who was the on-call attending physician for the pediatric intensive care unit (hereinafter "PICU") employed by respondent Pediatrix. Dr. Hawks-Henley relayed the emergency regarding Amber and advised Dr. Caceres that Amber was being transferred to the PICU. Between 2:45 and 3:00 a.m., following Amber's admission to the PICU, Dr. Hawks-Henley made a second call to Dr. Caceres wherein they developed a treatment plan, including ordering a blood gas test and chest x-ray. Dr. Caceres apparently advised Dr. Hawks-Henley to notify him if the seizure medication was ineffective. Around 3:35 a.m., Dr. Hawks-Henley called Dr. Caceres a third time to advise that Amber's anti-seizure medication was not working.

---

[1] Encephalitis is a swelling of the brain; in this instance, the swelling was caused by the mosquito-transmitted La Crosse virus.

[2] Although the record is not entirely clear, the parties appear to agree that Amber was stuck up to a dozen times in an attempt to place the new IV and during the process, she began crying and hyperventilating.

As a result of this third call, Dr. Caceres came to the hospital to intubate Amber as a result of the seizures.

Although the testimony is somewhat unclear as to the precise time, Dr. Caceres arrived at CAMC sometime between 3:40 and 3:50 a.m. Upon arrival at the hospital, Dr. Caceres was notified of the blood gas results indicating that Amber was suffering from respiratory acidosis which required immediate intubation, although Dr. Caceres testified he had already planned to intubate due to the seizures. Dr. Caceres immediately intubated Amber, which he completed no later than 4:00 a.m. All parties agree that there is no evidence as to when the blood gas results were actually completed and available. Notwithstanding these interventions, Amber died the following day.

Petitioner filed a medical malpractice suit against CAMC as a result of Amber's death and subsequently amended her complaint to include respondent as a defendant, alleging that Dr. Caceres was negligent in managing Amber's airway. Dr. Caceres and respondent's experts testified in deposition that Amber died from inflammation of the brain due to the La Crosse virus. However, petitioner's lone expert, Dr. Marc Weber, took the position that Amber's death was the result of an hypoxic ischemic event, resulting from laryngospasm which occurred when she was in the

3

treatment room.[3] Dr. Weber testified that the failure to more emergently intubate Amber contributed "somewhat" to her death.

With respect to the alleged medical negligence of Dr. Caceres, Dr. Weber opined generally that "there should have been a more emergent intubation and airway management" while she was in the PICU. He had no criticisms of the care Amber was given in the treatment room, nor of Dr. Hawks-Henley. Rather, Dr. Weber's sole criticism of Amber's care was, more specifically, that "the airway should have been managed more aggressively at or around the time that the blood gas results were returned." He conceded, however, that he did not know when the blood gas results were returned and had no evidence that Dr. Caceres knew about the blood gas results prior to arriving at the hospital. Dr. Weber testified that he had no criticisms of Dr. Caceres' actions once he was aware of the blood gas results, intubating rapidly and appropriately.[4] Dr. Weber further testified that he could not quantify "any worsening by a claimed failure

---

[3] In short, Dr. Weber opined that during the attempt to reinsert her IV, Amber became upset, vomited, and aspirated into her upper airway. The acid in her upper airway then irritated her larynx, which went into laryngospasm, cutting off her ability to move air. This absence of ability to move air then caused the hypoxic ischemic event, *i.e.*, a lack of oxygen and/or blood flow to the brain. Dr. Weber conceded, however, that he could not point to evidence that Amber failed to move air for some finite period of time and that the medical records are inconsistent with this theory. Dr. Weber further conceded that the only other possible cause of death was that opined by Dr. Caceres—inflammation of the brain from the virus. He also opined that the laryngospasm which was the triggering event for the hypoxic ischemic event occurred while Amber was in the treatment room around 2:15 a.m., before Dr. Caceres was contacted regarding her care.

[4] The particular portions of Dr. Weber's testimony are set forth more fully in the Discussion section, *infra*.

to intubate earlier" and that he could not say to a reasonable degree of medical probability that Amber would have lived if she had been intubated earlier.

Within days of Dr. Weber's deposition, on May 20, 2011, both respondent and CAMC filed motions for summary judgment. Petitioner responded to the motion, relying solely on the testimony of Dr. Weber to oppose the motion, and asserting that Dr. Weber's testimony was sufficient to create a material issue of disputed fact. Petitioner did not supplement Dr. Weber's deposition testimony, provide additional evidence, or file an affidavit pursuant to W.V.R.C.P. 56(f) seeking additional discovery.[5] On July 15, 2011, the court conducted a pretrial conference, in the face of a pending motion to continue by petitioner, and heard argument on both CAMC and respondent's motions for summary judgment. The court continued the trial to March 12, 2012, denied both motions for summary judgment, and indicated that discovery would not be reopened in the interim.

On February 23, 2012, respondent renewed its motion for summary judgment; petitioner filed the same response she previously submitted. At the rescheduled pretrial conference on March 5, 2012, the court entertained further argument

---

[5] *See* Syllabus Point 3, *Williams v. Precision Coil, Inc*., 194 W.Va. 52, 459 S.E.2d 329 (1995) ("If the moving party makes a properly supported motion for summary judgment and can show by affirmative evidence that there is no genuine issue of a material fact, the burden of production shifts to the nonmoving party who must either (1) rehabilitate the evidence attacked by the moving party, (2) produce additional evidence showing the existence of a genuine issue for trial, or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f) of the West Virginia Rules of Civil Procedure.")

on respondent's motion for summary judgment,[6] took it under advisement and directed petitioner and respondent to report back by March 7 as to whether they could reach settlement. The parties thereafter reported by phone on March 7 that they could not reach a settlement; at that time, the court announced that it was granting respondent's motion for summary judgment and directed respondent's counsel to prepare the order. On July 26, 2012, the circuit court entered an order granting summary judgment in favor of respondent.[7]

In its order, the court concluded that there was no material dispute of fact regarding the time of Dr. Caceres' receipt of the blood gas results inasmuch as Dr. Weber conceded that he had no evidence to suggest that Dr. Caceres had the blood gas results prior to his arrival at the hospital and that, thereafter, he met the appropriate standard of care by "properly and timely intubating the patient." The court further found that petitioner had failed to establish proximate cause since "Dr. Weber admitted his inability to testify as to proximate causation with respect to the timing of the intubation . . . [and that] he could not say that the patient more likely than not would have lived if the blood gas result had been given to Dr. Caceres earlier than 3:50 a.m." It is from this order that petitioner now appeals.

---

[6] Petitioner settled with CAMC at some point prior to the rescheduled pretrial conference.

[7] The parties exchanged several motions related to respondent's proposed order and for reconsideration of the summary judgment.

6

## II. STANDARD OF REVIEW

"This Court reviews *de novo* the denial of a motion for summary judgment, where such a ruling is properly reviewable by this Court." Syl. Pt. 1, *Findley v. State Farm Mut. Automobile Ins. Co.*, 213 W.Va. 80, 576 S.E.2d 807 (2002). Moreover, "[s]ummary judgment is appropriate if, from the totality of the evidence presented, the record could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove." Syl. Pt. 2, *Williams v. Precision Coil, Inc.*, 194 W. Va. 52, 459 S.E.2d 329 (1995). With these standards in mind, we turn to the parties' arguments.

## III. DISCUSSION

Petitioner makes only one assignment of error—that the circuit court erred in granting summary judgment because the case presented disputed issues of material fact.[8] In support of this assignment, petitioner contends that Dr. Weber's general

_____

[8] During oral argument before this Court, petitioner made much of the fact that the circuit court initially denied respondent's motion for summary judgment and subsequently granted it without any additional developments or discovery. First, and most importantly, we note that petitioner did not assign this as error, nor did petitioner make more than a passing reference to the circuit court's "reversal" of its prior ruling in her brief. West Virginia Rule of Appellate Procedure 10(c)(3) requires the petitioner to include all assignments of error presented for review, which assignments must be accompanied by "an argument exhibiting clearly the points of fact and law presented . . . citing the authorities relied on[.]" W.V.R.A.P. 10(c)(7). This Court has repeatedly stated that it "ordinarily will not address an assignment of error that was not raised in a petition for appeal." *Canterbury v. Laird,* 221 W.Va. 453, 458, 655 S.E.2d 199, 204 (2007); *see also Koerner v. West Virginia Dep't. of Military Affairs & Pub. Safety*, 217 W.Va. 231,

criticism that Amber's "airway should have been managed more aggressively" is sufficiently inculpatory of Dr. Caceres to establish a breach of the standard of care. Petitioner argues further that the facts surrounding the "triggering event" for Dr. Caceres' more emergent management of Amber's airway are disputed and require resolution by the jury. Respondent counters that, through the course of cross-examination, Dr. Weber ultimately failed to articulate a breach of the standard of care against respondent and that petitioner failed to demonstrate a trialworthy issue preclusive of summary judgment.

---

617 S.E.2d 778 (2005) (refusing to consider an argument in appellant's brief that was not assigned as error in petition for appeal); *Holmes v. Basham*, 130 W.Va. 743, 45 S.E.2d 252 (1947) (same). Moreover, "[a]lthough we liberally construe briefs in determining issues presented for review, issues which are not raised, and those mentioned only in passing but are not supported with pertinent authority, are not considered on appeal." *State v. LaRock*, 196 W.Va. 294, 302, 470 S.E.2d 613, 621 (1996). *See also Morris v. Painter,* 211 W.Va. 681, 685, 567 S.E.2d 916, 920 (2002) (citing cases refusing to address issues not properly briefed or preserved for appeal).

Nevertheless, we find nothing in our jurisprudence which would prevent a lower court from exercising its discretion to revisit a previous denial of summary judgment in an effort to ensure the proper administration of justice. *See Keystone Ranch Co. v. Cent. Neb. Pub. Power and Irrigation Dist.,* 465 N.W.2d 472, 475 (Neb. 1991) (finding that denial of summary judgment motion was interlocutory order which could be reconsidered by the court); *Bringewatt v. Mueller,* 272 N.W.2d 37, 38-9 (Neb. 1978) (finding that trial court, in its discretion, may permit renewal and resubmission of a motion for summary judgment which has previously been denied); *Tabet Lumber Co., Inc. v. Romero,* 872 P.2d 847, 849 (N.M. 1994) (holding that court had "'the inherent authority to reconsider its interlocutory orders, and it is not the duty of the [district court] to perpetuate error when it realizes it has mistakenly ruled.'" (citing *Melnick v. State Farm Mut. Auto. Ins. Co.*, 749 P.2d 1105, 1107 (N.M. 1988)); *Maxey v. Lenigar,* 471 N.E.2d 1388, 1389 (Ohio Ct. App. 1984) ("If the trial court errs in overruling a motion for summary judgment, it is not necessary that that court wait until the judgment is reversed upon appeal . . . the court may correct its error . . . upon a new motion for summary judgment predicated upon the same law and facts."); *Grace v. Zimmerman*, 853 S.W.2d 92, 98 (Tex. Ct. App. 1993) ("[A] trial court has the discretion to reconsider its prior order denying a motion for summary judgment and to rescind that order and enter an order granting the motion.").

West Virginia Code § 55-7B-3(a) provides that the "necessary elements of proof" to support a medical malpractice cause of action are:

> (1) The health care provider failed to exercise that degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances; and
>
> (2) Such failure was a proximate cause of the injury or death.

Further, West Virginia Code § 55-7B-7(a) (2003) states that a defendant's failure to meet the applicable standard of care "shall be established . . . by testimony of one or more knowledgeable, competent expert witnesses if required by the court."[9] *See* Syl. Pt. 2, *Roberts v. Gale,* 149 W. Va. 166, 139 S.E.2d 272 (1964) ("It is the general rule that in medical malpractice cases negligence or want of professional skill can be proved only by expert witnesses.").

We first address petitioner's argument that Dr. Weber's broad criticism of Dr. Caceres' failure to "more emergently manage" Amber's airway is sufficient alone to establish a breach of the standard of care; therefore, she presented a trialworthy issue. While petitioner is correct that Dr. Weber did levy this general criticism at Dr. Caceres, upon cross-examination, he significantly qualified this opinion by premising it upon the

---

[9] Petitioner does not expressly assert that expert testimony was not required in the instant case to establish the elements of a medical negligence case. Rather, the issue presented herein, as framed by the parties, is one of the *sufficiency* of the expert's testimony as pertains to the required elements of proof and the existence of disputed issues of material fact.

timing of a very specific occurrence—Dr. Caceres' receipt of Amber's blood gas results. The following are excerpts from Dr. Weber's deposition which form the parameters of his opinion and, importantly, narrow the factual basis upon which his opinion rests:

> Q. . . . You don't have any criticisms of Dr. Caceres while the patient was up on the pediatrics unit; right?
>
> A. Well, I think we've talked that I think that the airway should have been managed more aggressively at or around the time that the blood gas results were returned. . . .
>
> ***
>
> Q. So you would expect Dr. Caceres, that once he is told about the blood gas results, that that is when you would find that he needed to intervene with the patient?
>
> A. In terms of airway management, yes.
>
> Q. And airway management is your exclusive criticism in this case?
>
> A. Yes.
>
> Q. Do you have any basis to refute that the first time Dr. Caceres was told about the blood gas results was when he arrived?
>
> A. I don't have any basis other than what that one note [regarding the time the blood gas was *collected*] says. . . .
>
> ***
>
> Q. You have no basis to say that Dr. Caceres knew about the blood gas results before 3:45 to 3:50 a.m. [Dr. Caceres' approximate arrival time at the hospital], isn't that true?
>
> A. I don't have a basis for that. That's correct.
>
> ***

Q. So I want to make sure. You have no criticism of Dr. Caceres before 3:45 a.m., correct?

A. I don't have any criticism prior to the time that he was aware or should have been aware of the blood gas result. That's correct.

Q. And once he was aware of the blood gas result, Dr. Caceres completed the intubation effectively and timely, did he not?

A. That's correct. Once he arrived in the unit, it was a rapid sequence, intubation that was done without any apparent complications.

Q. And all of his other care was at all times appropriate and within the standard of care?

A. I believe so, yes.

***

Q. . . . From what you have testified to, there is no standard of care deviation committed by Dr. Caceres in his management of the airway; correct?

A. I think – other than I think it needed to have been done more emergently based on the blood gas results. . . . . Other than that, I agree with you.

Q. And the determination of emergent depends upon when the blood gas results were available to him; correct?

A. Or should have been available, but that's correct.

Q. Dr. Caceres is reliant upon the hospital system to process the blood gas, right?

A. Correct.

Q. And you have no basis or fact to dispute Dr. Caceres' testimony that the blood gas was first available to him when he arrived; correct?

11

Q.     That's correct.

Q.     And after he arrived, he immediately, timely and appropriately completed the intubation?

A.     Yes.

Q.     So, with respect to the timing of the intubation, once Dr. Caceres had the available blood gas, he acted appropriately and within the standard of care; right?

A.     Yes.  Once he had the result, that's correct.


As evidenced by this testimony, Dr. Weber opines that Amber should have been intubated sooner and that the first indication that intubation was emergently needed was the results of the blood gas labwork collected at 3:15 a.m.  Dr. Caceres testified— and Dr. Weber does not dispute—that Dr. Caceres first received the results upon arrival at the hospital.   Dr. Weber readily admits that upon receipt of the results, Dr. Caceres acted within the standard of care.  Critically, however, Dr. Weber concedes that he has no evidence that Dr. Caceres knew or should have known of the blood gas results before he arrived at the hospital.   Moreover, in opposition to summary judgment, petitioner provided no extraneous evidence to establish that the results of the blood gas labwork were complete and available before Dr. Caceres arrived at the hospital and, if so, when they were available.

Petitioner attempts to overcome this factual void by arguing that the absence of evidence on this issue merely creates a jury issue: "In fact, there is not only a

12

'material dispute of fact' over the time of th[e] 'triggering' event but in actuality the record leaves the matter entirely undetermined and thus a matter for the jury to decide for itself." Brief of Petitioner at 18.[10] Additionally, focusing on Dr. Weber's brief reference to the period of time when Dr. Caceres "should have known" about the blood gas results, petitioner further argues that it is for the jury to determine what additional steps Dr. Caceres should have taken to ascertain the results, which may or may not have been available, more quickly.

We believe that petitioner misapprehends her burden at summary judgment, particularly in the context of a medical negligence case, and overstates the jury's function with regard to factual deficits in evidence. With respect to petitioner's burden in opposing summary judgment, this Court has held that "'[u]nsupported speculation is not sufficient to defeat a summary judgment motion.'" *Williams*, 194 W. Va. at 61, 459 S.E.2d at 338 (quoting *Felty v. Graves–Humphreys Co*., 818 F.2d 1126, 1128 (4th Cir. 1987)). To that end,

> [w]hile it is true that "the nonmoving party is entitled to the most favorable inferences that may reasonably be drawn from the evidence, [such evidence] 'cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another.'" Further, "[t]he evidence illustrating the factual controversy cannot be conjectural or problematic."

---

[10] Petitioner offers no explanation for her failure to discover when the blood gas results were completed and available, except to say simply that the medical record does not indicate.

13

*Barbina v. Curry*, 221 W.Va. 41, 49, 650 S.E.2d 140, 148 (2007) (citations omitted).

It was clearly incumbent upon petitioner, given the substance of Dr. Weber's opinion and the factual conditions precedent upon which he based his opinion, to produce evidence in opposition to summary judgment that the blood gas results were actually available earlier and that the standard of care required Dr. Caceres to have acted differently to obtain them more quickly, *i.e.*, that he breached the standard of care. There is simply no evidence to establish whether the results were available earlier and, if so, when. More importantly, Dr. Weber offered no testimony regarding what, if anything, Dr. Caceres should have done differently to obtain any *theoretically* earlier available results.[11]

As this Court has previously observed, "[a] dispute about a material fact is 'genuine' only when a reasonable jury could render a verdict for the nonmoving party, if the record at trial were *identical to the record compiled in the summary judgment proceedings before the circuit court*." *Powderidge Unit Owners Ass'n v. Highland Props., Ltd.,* 196 W.Va. 692, 707, 474 S.E.2d 872, 887 (1996) (emphasis added). Petitioner simply seeks to have the jury "fill in the gaps" in her evidence and her expert's testimony. In her brief, petitioner glosses over the shortcomings in Dr. Weber's

---

[11] The paucity of evidence on this critical issue is particularly evident when considering the universe of possibilities relative to the completion of the labwork. For example, further investigation and discovery on this issue could equally reveal 1) that the labwork was not processed promptly; 2) that the labwork was not ordered properly; 3) that employees of CAMC had the results but failed to timely communicate them to Dr. Caceres and/or otherwise act upon them, or any other number of innocuous possibilities.

14

testimony by characterizing it as "subtle," "nuanced," and "highly conditioned." Indeed, what Dr. Weber's opinion is "conditioned" upon is the existence of facts of which petitioner offered no proof. *See Withrow v. West Virginia Univ. Hosps., Inc.,* 213 W. Va. 48, 576 S.E.2d 527 (2002) (finding lack of factual predicate rendered expert testimony insufficient to establish breach of standard of care). For the jury to determine when the blood gas results were available and what the standard of care would require of Dr. Caceres in terms of obtaining the results sooner, to whatever extent they were available sooner, requires the jury to engage in absolute speculation.[12] Not unlike the appellants in *Powderidge*, petitioner's opposition before the circuit court and arguments before this Court "amount[] to nothing more than an attorney's argument lacking evidentiary support." *Powderidge,* 196 W. Va. at 707, 474 S.E.2d at 887; *see also Williams,* 194

---

[12] Despite conceding that the "triggering event" for airway management was the return of the blood gas results, but in an effort to escape the narrow confines of her expert's testimony, petitioner suggests that the circuit court should have permitted a jury to assess whether Dr. Caceres committed any acts of negligence during the events leading up to his receipt of the blood gas labwork. Petitioner contends that the critical issue in the case is what Dr. Caceres "did or should have done" during the approximate hour and half period between his first contact with Dr. Hawks-Henley and the time he intubated Amber. Petitioner speculates that perhaps Dr. Caceres "either should have left for the hospital earlier than he did or have instructed somebody on site to start blood gas studies earlier and then to do the intubation procedure in his absence."

However, Dr. Weber himself foreclosed such an argument by testifying 1) that his "exclusive criticism" in the case was the lack of more emergent airway management through intubation; and 2) that the "earliest" that the intubation should have occurred was "around the time [that] . . . the arterial . . . blood gas result should have been returned to the unit." Simply put, petitioner designated one expert in this case, who identified only one ostensible breach of the standard of care by Dr. Caceres as outlined above. Despite having every opportunity to do so, Dr. Weber simply did not testify, *nor even suggest*, that Dr. Caceres should have ordered the blood gas studies earlier, come to the hospital sooner, or instructed someone to intubate in his absence.

15

W.Va. at 61 n.14, 459 S.E.2d at 338 n.14 ("self-serving assertions without factual support in the record will not defeat a motion for summary judgment"). We therefore find that the circuit court properly concluded that petitioner failed meet her burden in resisting respondent's motion for summary judgment.

Finally, although petitioner's argument on this issue is cursory, we further find that the circuit court correctly concluded that petitioner failed to present sufficient evidence of proximate cause. "In a malpractice case, the plaintiff must not only prove negligence but must also show that such negligence was the proximate cause of the injury." Syl. Pt. 4, *Short v. Appalachian OH-9, Inc.*, 203 W. Va. 246, 507 S.E.2d 124 (1998). Moreover, "[w]here a physician is testifying as to the causal relation between a given physical condition and the defendant's negligent act, he need only state the matter in terms of a reasonable probability." Syl. Pt. 3, *Hovermale v. Berkeley Springs Moose Lodge No. 1483,* 165 W.Va. 689, 271 S.E.2d 335 (1980). Petitioner argues that proximate causation was an issue for the jury, despite Dr. Weber conceding that he could not state to a reasonable degree of probability that Amber would have survived if intubated earlier and his commensurate inability to "quantify" any worsening in her condition caused by a purported delay in intubation.[13]

---

[13] Petitioner does not contend that she was pursuing a "loss of chance" theory of recovery as codified in West Virginia Code § 55-7B-3(b); *see also Thornton v. CAMC*, 172 W. Va. 360, 305 S.E.2d 316 (1983).

16

Petitioner cites two cases in support of her claim that she produced sufficient evidence on proximate cause to reach the jury. We find that a careful review of the facts of both cases demonstrate that they are factually distinguishable and frankly, simply highlight the deficiencies in petitioner's evidence in this case. In *Estate of Fout-Iser v. Hahn*, 220 W. Va. 673, 649 S.E.2d 246 (2007), this Court reversed the circuit court's grant of summary judgment in favor of the defendant doctor, Dr. Rhee, finding that the plaintiffs therein had presented sufficient evidence of both negligence and proximate cause. With respect to proximate cause and *citing specific testimony from both a retained expert and a treating physician, each of whom clearly established proximate cause*, the Court held that the circuit court erred in granting summary judgment.[14] *Id.* at 678-79, 649 S.E.2d at 251-52.

---

[14] As is made apparent by Justice Davis' dissent in *Fout-Iser* wherein she disagreed with the manner in which the majority resolved the case, the ostensible basis upon which the circuit court entered summary judgment for Dr. Rhee was plaintiffs' failure to properly disclose these particular witnesses as experts on the issue of causation. 220 W. Va. at 682, 649 S.E.2d at 255 (Davis, C.J., dissenting). As such, the issue in that case was not the *sufficiency* of the testimony on causation, but rather the propriety of utilizing these particular witnesses for that issue. Unfortunately, the majority failed to even identify or analyze this issue, finding simply that two witnesses in the case provided testimony regarding causation, which was sufficient to carry the case to the jury.

Nevertheless, we find Justice Davis' comments therein regarding the necessary proof of causation in a medical negligence case to be particularly instructive in the instant case where petitioner's disclosed expert likewise did not provide testimony of causation. With regard to the lone expert which appellants *did* disclose as their expert on causation in *Fout-Iser*, Justice Davis' dissent exposes the fatal shortcomings in his testimony, wherein he twice testified that he could not say that but for Dr. Rhee's negligence it "would have made any difference in the outcome of [the case]." *Id.* at 683 n.7, 649 S.E.2d at 256 n.7. Justice Davis correctly concluded that

17

Similarly, in *Stewart v. George*, 216 W. Va. 288, 607 S.E.2d 394 (2004), also cited by petitioner, this Court found the entry of summary judgment erroneous where plaintiff's retained expert testified that the defendant doctor's failure to diagnose and treat hyperglycemia created a risk factor which contributed to plaintiff's development of infection. Dismissing the defendant doctor's argument that the expert did not exclude every other possible contributing cause, this Court found that the expert's testimony clearly reflected his opinion that the doctor's negligence was a causative factor in his development of an infection. *Id*. at 293, 607 S.E.2d at 399.

Unlike both of these cases, petitioner herein has provided not a single medical witness who offered testimony causally connecting Amber's death to Dr. Caceres' alleged negligent failure to intubate earlier. In fact, the only witness whose testimony petitioner offered in opposition to summary judgment expressly stated he *could*

---

> [i]nsofar as the Isers designated only one expert to testify as to causation with respect to Dr. Rhee and that one expert, Dr. Dicke, failed to provide evidence that Dr. Rhee's conduct was a proximate cause of the Isers' injuries, the Isers have not sustained their burden of proof on causation as it relates to Dr. Rhee.

*Id*. It is obviously this critical absence of testimony on proximate causation which prompted the plaintiffs in *Fout-Iser* to revert to utilizing non-disclosed witnesses to provide testimony on causation. That same critical absence is present in the case *sub judice* and petitioner has provided no alternative evidence.

*not* proximately relate Amber's death to any actions of Dr. Caceres to a reasonable degree of medical probability:

> Q.      You cannot say more likely than not that this patient would have lived if the blood gas value would have been given to Dr. Caceres earlier?
>
> A.      That's correct.

While petitioner urges that the jury may nonetheless infer proximate cause notwithstanding her lack of medical testimony on this issue, we find there is quite simply nothing upon which a jury may make such an inference beyond abject speculation.[15] The

---

[15] In that regard, we take note of another case cited by petitioner (although not cited for the proposition to which it actually pertains) which reflects the circumstances under which a party may reach a jury on the issue of proximate cause through the use of reasonable inferences in a medical negligence case. In *Sexton v. Grieco*, 216 W. Va. 714, 720, 613 S.E.2d 81, 87 (2005), we found that it was reversible error for the trial court to grant judgment as a matter of law in favor of the defendant doctors where the jury could reasonably infer causation from an expert's testimony. Plaintiff's expert testified to the effect that all other potential causes of plaintiff's injury were reasonably excluded as having caused plaintiff's injury, leaving only the negligence of the defendant doctors. The trial court determined that due to plaintiff's attorney's failure to ask a "'direct' question . . . on the issue of proximate causation," plaintiff failed in her burden to establish causation. *Id*. at 717, 613 S.E.2d at 84. After debating the continued viability of Syllabus Point 1 of *Pygman v. Helton*, 148 W. Va. 281, 134 S.E.2d 717 (1964), which permits a party to survive summary judgment if the evidence is "of such character as would warrant a reasonable inference by the jury that the injury in question was caused by the negligent act or conduct of the defendant," we found that the expert's testimony clearly demonstrated the existence of proximate cause and rejected the notion that he was required to express causation by way of a "'rigid incantation.'" *Sexton,* 216 W. Va. at 720, 613 S.E.2d at 87 (citing *Hovermale*, 165 W. Va. at 696, 271 S.E.2d at 340). As such, we found that the expert testimony was "of such character" as to permit the inference described in *Pygman*. *Id.*

lack of expert medical testimony as to causation was therefore equally fatal to petitioner's case as her failure to present a disputed issue of material fact on medical negligence. *See Hicks v. Chevy*, 178 W. Va. 118, 121, 358 S.E.2d 202, 205 (1987) ("Proof that the negligence or want of professional skill was the proximate cause of the injury of which the plaintiff complains must ordinarily be by expert testimony as well."); *Short,* 203 W. Va. at 254, 507 S.E.2d at 132 (finding failure to produce expert testimony on causation in opposition to summary judgment fatal); *Farley v. Shook*, 218 W. Va. 680, 686, 629 S.E.2d 739, 745 (2006) (finding summary judgment proper in medical malpractice case where plaintiffs' expert "was unable to link any of the[] alleged breaches in care to the ultimate outcome"); *cf. Totten v. Adongay*, 175 W.Va. 634, 639-40, 337 S.E.2d 2, 8 (1985) (distinguishing cases where causation is "reasonably direct or obvious" as obviating need for expert medical testimony). Accordingly, we likewise find no error in the circuit court's conclusion that petitioner failed to present evidence of proximate cause sufficient to survive summary judgment.

---

This case presents no such similar facts or testimony upon which a jury could base a "reasonable inference." *See Serbin v. Newman*, 157 W. Va. 71, 198 S.E.2d 140 (1973) (finding "speculative" expert testimony insufficient to warrant reasonable inference by the jury on causation). Moreover, permitting a jury to draw inferences from evidence is not the functional equivalent of speculation. *See also* Syl. Pt. 4, *Kyle v. Dana Transport, Inc.*, 220 W.Va. 714, 649 S.E.2d 287 (2007) (requiring threshold showing in res ipsa loquitur cases of sufficient evidence "that will lead to reasonable inferences by the jury" as opposed to evidence "which would force the jury to speculate in order to reach its conclusion").

## IV. CONCLUSION

For the foregoing reasons, the July 26, 2012, order of the Circuit Court of Kanawha County is affirmed.

Affirmed.