# IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA

Spring 2026 Term

_____

No. 25-ICA-224

_____

FILED

**May 18, 2026**

released at 3:00 p.m.
ASHLEY N. DEEM, CHIEF DEPUTY CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

SAMUEL HERNANDEZ
and ZUSMITHA ARNESTO,
Plaintiffs Below, Petitioners

v.

CITY HOSPITAL, INC. d/b/a
WVU MEDICINE/BERKELEY MEDICAL CENTER,
Defendant Below, Respondent

_____

Appeal from the Circuit Court of Berkeley County
Honorable Laura Faircloth, Judge
Civil Action No. CC-02-2022-C-52

REVERSED and REMANDED

_____

Submitted: April 14, 2026
Filed: May 18, 2026

C. Edward Amos II, Esq.
Scott S. Segal, Esq.
Segal & Amos, PLLC
Charleston, West Virginia
Counsel for Petitioners

Lauren T. Krupica, Esq.
Joshua K. Boggs, Esq.
West Virginia United Health System, Inc.
Morgantown, West Virginia
Counsel for Respondent

CHIEF JUDGE GREEAR delivered the Opinion of the Court.

GREEAR, Chief Judge:

Petitioners, Samuel Hernandez and Zusmitha Arnesto, appeal the Circuit Court of Berkeley County's March 12, 2025, order granting summary judgment in favor of Respondent, City Hospital, Inc. d/b/a WVU Medicine/Berkeley Medical Center ("BMC"), and May 7, 2025, order denying petitioners' motion to reconsider the order granting summary judgment to BMC. In the March 12, 2025, order, the circuit court found that petitioners failed to offer sufficient evidence to establish a prima facie case of medical professional liability under West Virginia Code § 55-7B-3. Specifically, the circuit court found that petitioners failed to present evidence connecting the alleged breaches of the standard of care to Mr. Hernandez's damages such that a reasonable jury could infer a causal connection, either through direct causation or a loss of chance theory.

Petitioners argue on appeal that the circuit court erred in: (1) failing to review all facts and permissible inferences in a light most favorable to petitioners as the nonmoving party; (2) finding there was no genuine dispute of material fact as to causation; and (3) usurping the fact-finding role of the jury. Based upon our review of the record, applicable law, and the oral and written arguments of counsel, we find that the circuit court erred by granting summary judgment to BMC. Petitioners offered expert testimony as to causation that is sufficient to submit their claim to a jury. Any alleged deficiencies in the evidentiary record bear on the weight, rather than the sufficiency, of the experts' testimony

1

and, therefore, present questions of fact for the jury. Accordingly, we reverse the circuit court's entry of summary judgment and remand this case for further proceedings.

## I.     FACTUAL AND PROCEDURAL HISTORY

This is a medical malpractice case in which petitioners allege that BMC-employed nurses, therapists, and other non-physician care staff ("BMC care staff") breached various standards of care in their inpatient treatment of Mr. Hernandez following spinal surgery. Petitioners claim that BMC care staff failed to escalate Mr. Hernandez's post-surgical condition through their chain of command and seek a second opinion from a qualified physician prior to his discharge. Petitioners allege that these deviations in the standard of care prevented Mr. Hernandez from receiving proper medical treatment, including MRI studies and an additional surgical intervention, proximately causing him to sustain permanent neurological damage and physical impairment.

On February 17, 2020, Mr. Hernandez tripped and fell, sustaining an injury to his cervical vertebrae. He received medical care at the University of Virginia Medical Center ("UVA") until his discharge on February 20, 2020. At UVA, imaging revealed osteophyte complexes of Mr. Hernandez's cervical spine, resulting in chronic spinal stenosis or spinal canal narrowing at levels C5-6 and C6-7. UVA recommended that Mr. Hernandez obtain close follow-up care at UVA's spine center and remain in a cervical collar until reevaluation. Instead, Mr. Hernandez elected to pursue follow-up care locally.

On February 25, 2020, Mr. Hernandez sought outpatient care from neurosurgeon Ravi Yalamanchili, M.D. Dr. Yalamanchili's plan of care for Mr. Hernandez included preoperative steroid therapy and an anterior cervical discectomy and fusion ("ACDF") at C5-6 and C6-7. Mr. Hernandez was admitted to BMC on March 6, 2020, for the ACDF procedure, at which time he was ambulatory and continent of bowel and bladder. Dr. Yalamanchili performed the surgery at approximately 1:20 p.m. that day. After the surgery, Mr. Hernandez was unable to move his lower extremities and exhibited weakness in his left arm. Dr. Yalamanchili ordered a STAT MRI, which showed that Mr. Hernandez's spinal stenosis persisted with osteophytes continuing to compress his spinal cord at C5-6 and C6-7. As a result, Dr. Yalamanchili performed a second ACDF procedure that evening. The next day, Mr. Hernandez remained unable to move his lower extremities and experienced severe numbness in both his upper and lower extremities. As a result, he was diagnosed with paraplegia and motor deficits.

According to the medical records, Dr. Yalamanchili and BMC care staff regularly assessed Mr. Hernandez in the week following these procedures. BMC care staff documented mixed findings: Mr. Hernandez had weak grips and numbness in his extremities; retained the ability to raise his right arm; demonstrated some improvement in upper extremity strength but no lower extremity motor improvement; and, although showing daily progress and motivation and, eventually, the ability to use both hands, remained unable to feel or move his legs. On March 13, 2020, Mr. Hernandez was

3

discharged from BMC to Winchester Rehabilitation. At that time, he was quadriplegic and dependent on others for all activities of daily living.

About eleven months later, on February 5, 2021, Mr. Hernandez underwent a third spinal surgery, a decompressive cervical laminectomy from C3-C7 and posterolateral fusion from C2-T2, performed at Winchester Medical Center by David Salvetti, M.D., in an attempt to alleviate his remaining cervical spinal stenosis. A post-operative CT scan showed that the surgery resolved the "moderate to severe spinal stenosis with moderate cord compression at the C5-C6 level . . . ." Dr. Salvetti testified that Mr. Hernandez regained minor improvements in neurological function from that third surgery. Mr. Hernandez also testified that after the third surgery he regained the ability to sense temperature, feeling on his bottom and parts of his groin, and the ability to wiggle his toes when his leg spasms and is positioned straight in front of him. Despite these improvements, he remains wheelchair bound and dependent on others for activities of daily living.

Mr. Hernandez and his wife, Ms. Arnesto, filed a civil action in Berkeley County Circuit Court alleging that BMC, through its employed nurses, therapists, and staff, breached the applicable standards of care by: (1) "failing to provide proper independent assessments of Mr. Hernandez and the adverse changes in his condition"; (2) "failing to seek out proper physician interventions so that the cause of Mr. Hernandez'[s] decline in function could be properly diagnosed"; (3) "failing to be advocates for Mr. Hernandez and seek out proper medical care and treatment for his decline in function prior to his discharge

4

to rehabilitation"; and (4) "failing to use the chain of command to make sure that Mr. Hernandez'[s] deteriorating condition was properly assessed and treated before he was discharged to rehabilitation."[1] The case proceeded to discovery during which petitioners' causation experts—spine surgeon Richard Ozuna, M.D., and hospitalist Aaron Leo Gottesman, M.D.—opined that BMC care staff breached the applicable standards of care by failing to escalate Mr. Hernandez's post-surgical condition through the chain of command and seek a second opinion beyond the assigned medical team before his discharge. Drs. Ozuna and Gottesman opined that these breaches prevented additional radiological imaging after Mr. Hernandez's second procedure and a timely surgical decompression of his spine, causing irreversible neurological damage and loss of function.

Dr. Ozuna testified that, if BMC care staff had escalated Mr. Hernandez's neurological decline through the chain of command, proper interventions by qualified physicians would have included further radiological imaging and a spinal decompression, which if initiated, would have resulted in a greater than twenty-five percent chance of improvement.

> Q. Your disclosure states that, "To a reasonable degree of medical probability, if nursing staff had gone up their chain of command, which may include notifying risk management, Mr. Hernandez would have received a proper medical assessment prior to his discharge; he would have been provided additional radiological studies following the second March 6, 2020, surgery and before his discharge . . . and proper surgical

---

[1] Petitioners also asserted claims against Dr. Yalamanchili and hospitalists Manie Juneja, M.D., and Mehmet T. Kutlu, M.D., who provided care to Mr. Hernandez at BMC but were not employed by the facility, as well as a loss of consortium claim by Ms. Arnesto.

intervention to decompress his spinal cord." So, to a reasonable degree of medical probability, you are speculating that an RN reporting this case to risk management would have resulted in risk management or whomever entirely upending Dr. Yalamanchili's and the hospitalists' plan of care?

A. Yes, I think so.

***

Q. Okay. And are there any BMC policies other than what we looked at, or including what we looked at,[2] that you base that on?

A. No.

Q. No transcripts or anything in the medical record that you base that on?

A. No.

Q. No conversations with anybody from BMC?

A. (No audible response.)

Q. Is that no?

A. No. That's a no. Sorry.

Q. That's okay. So this is just your – your guess?

***

A. This is my opinion.

Q. And your opinion is based on what? That's what I'm trying to –

A. Everything we just talked about. The – the – the policy. The lack of pushing it up. The lack of, I guess, realizing that something else could be done.

---

[2] Earlier in his deposition, Dr. Ozuna confirmed that he had reviewed BMC's Medical Staff Rules and Regulations.

Q. So your opinion assumes that Mr. Hernandez's condition after the second surgery could have been altered?

A. Yes.

Q. . . . There's also a possibility that his condition was unchangeable after the second surgery; is that fair?

A. That's fair.

Q. And if that was the case, there was nothing the nurses or the OTs or PTs could have done to change his outcome; is that correct?

A. If we assume that he was not going to get better, that is correct. But we don't know. We do know he did get better after his third surgery a year later.

Dr. Ozuna's testimony included his opinions regarding the standard of care required of the physicians providing care to Mr. Hernandez:

Q. Do you have an opinion within a reasonable degree of medical certainty as to whether Mr. Hernandez had a greater than 25 percent chance of an improved recovery had Dr. Yalamanchili met the standard of care?

A. Yes, I believe that.

Q. And let me ask it this way then: What is your opinion?

A. My opinion is that if he had had an earlier decompression he could have had a chance at improvement, and I believe it's more than 25 percent within reasonable medical certainty.

Q. When you say had he had an earlier decompression, was earlier decompression required to meet the standard of care?

A. Yes.

Q. Doctor, do you have an opinion, based upon a reasonable degree of medical certainty, as to whether Mr. Hernandez had a greater than 25 percent chance of an improved recovery had Dr. Juneja and Dr. Kutlu performed an MRI before his discharge and sought a second opinion?

A. Yes, I believe so.

Q. And do you believe that they should have done that to meet the standard of care?

A. Yes, I do.

Q. . . . What is your opinion in that regard? You may have said it, but I missed it.

A. Yes. If they had initiated at least an MRI, triggered the consult from a second opinion that evaluated the situation, they would have decompressed the patient similar to what Dr. Salvetti did a year later, and the patient would have had some improvement. He had improvement 12 months later.

Q. And do you think that improvement would have been greater than 25 . . . or that there would have been a –

A. Yes, I do.

Q. – greater than 25 percent chance of an improvement?

A. Yes.

Q. Dr. Ozuna, lastly, do you have an opinion, based on a reasonable degree of medical certainty, as to whether Mr. Hernandez had a greater than 25 percent chance of an improved recovery had the nursing staff, the therapists, and the other hospital staff that were treating or caring for Mr. Hernandez in his postoperative period between the 6th and the 13th exercised their chain of command and sought a – a second opinion of his condition?

A. I do.

Q. And what –

A. Yes.

Q. – is your opinion?

A. Yes. My opinion is that he would have had a greater than 25 percent chance of improvement within a reasonable medical certainty if he'd had some notification of staff above and initiated the care that we just outlined.

Q. And, Doctor, do you have an opinion as to whether exercising the – the chain of command and – and the policy that was shown to you by defense counsel, if the nurses and staff, therapists, had – if that would be the standard and care . . . under the circumstances of Mr. Hernandez's situation?

A. Yes, I do.

Q. And what is that opinion?

A. That – same – same as before, that if they had notified somebody above that could initiate the process that we outlined, the care would have been improved, and his chances of improvement would be more than 25 percent within reasonable medical certainty.

Dr. Gottesman testified that BMC care staff breached the standards of care by violating BMC's Medical Staff Rules and Regulations, which required them to escalate Mr. Hernandez's case through "the chain of command to the vice president of patient care services, and go beyond that if necessary to the CEO, president of the medical staff, et cetera," who would do an external review. Dr. Gottesman opined that had BMC care staff escalated Mr. Hernandez's case through appropriate channels, a "chain reaction" would

more likely than not have occurred, resulting in a reversal of some of Mr. Hernandez's neurological and motor damage. Relevant here, Dr. Gottesman testified:

> Q. So what I'd like to understand before trial is how these nurses' failure to make the call to . . . escalate caused Mr. Hernandez's paraplegia.
>
> A. Well sure. In my opinion, . . . had the nursing staff escalated the call, there is a chain reaction which, in my opinion, hopefully and more likely than not, I hope, would have occurred, which would have been that whoever the collective nursing staff would have escalated this case to would have acted upon this information and would have communicated with an external neurosurgeon, the head of service, or the other neurosurgery group working in this hospital to do a second opinion on quality basis and to reassess the case.
>
> I obviously can't guarantee the outcome, and I'm not going to say that, "Had that been done, 100 percent that there would have been this -- would have been done, and there would have been a complete reversal."
>
> I think a competent neurosurgeon . . . would have realized what happened and hopefully would have intervened and reversed at least some of this damage. But the first step of triggering that on the nursing side would have been the escalation process.
>
> Q. So . . . your assumption is that after that second surgery, something could have been done to reverse the . . . paralysis that he was experiencing after that; is that correct?
>
> A. I think at least would have reversed some of the damage that was done. I, of course, can't tell you that all of it would have been completely reversed and he would have been completely back to a completely functional state, but it's my opinion that he certainly would have recovered function certainly beyond what he did eventually, which was very little.
>
> Q. Do you believe that you are qualified . . . to express that opinion?

A. I'm not qualified to say with absolute certainty that had he had the surgery at some point between the 7th and the 13th that he would have completely recovered his function, nor to what degree he would have recovered. But I'm of the opinion that had surgery been done to relieve the compression of the spinal cord, certainly a degree of recovery would have returned. I mean, we know from a year later that he had surgery almost a year later, and he recovered some function at that point in time. It stands to reason that the earlier this decompression would have been successfully performed that he would have recovered even more function.

BMC moved for summary judgment pursuant to West Virginia Rule of Civil Procedure 56 arguing that petitioners' experts' causation opinions are speculative and fail to establish proximate cause. On March 12, 2025, the circuit court granted summary judgment to BMC. The circuit court found that Drs. Ozuna and Gottesman's opinions regarding the asserted "chain reaction" were speculative and unreliable because they were conditioned upon their "hopes" and assumed actions of third parties for which there was no evidentiary support. The circuit court went on to find that the record was devoid of any evidence establishing what would have occurred had BMC care staff escalated Mr. Hernandez's case through the chain of command. Based on this perceived gap in the record, the circuit court held that there was no basis upon which a jury could reasonably infer that any conduct of BMC was a proximate cause of Mr. Hernandez's injuries.[3] Thereafter, petitioners filed a motion to reconsider the order granting summary judgment to BMC. The

---

[3] The circuit court also dismissed Ms. Arnesto's only claim for loss of consortium because it is derivative and cannot be maintained independent of an underlying tort claim.

11

circuit court entered an order on May 7, 2025, denying the motion to reconsider. Petitioners now appeal the circuit court's March 12, 2025, and May 7, 2025, orders.

## II. STANDARD OF REVIEW

"A circuit court's entry of summary judgment is reviewed *de novo*." Syl. Pt. 1, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994). "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." *Id.* at 190, 451 S.E.2d at 756, syl. pt. 2 (citation modified). Moreover, "[s]ummary judgment is appropriate if, from the totality of the evidence presented, the record could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove." Syl. Pt. 2, *Williams v. Precision Coil Inc.*, 194 W. Va. 52, 459 S.E.2d 329 (1995).

## III. DISCUSSION

Petitioners assign three errors to the circuit court's orders. As these assignments of error are closely related, we consolidate them for our review. *See generally Tudor's Biscuit World of Am. v. Critchley*, 229 W. Va. 396, 402, 729 S.E.2d 231, 237 (2012) (per curiam) (permitting consolidation of related assignments of error). According to petitioners, the circuit court erred in finding that there was no genuine dispute of material fact as to causation because Drs. Ozuna and Gottesman testified in their expert opinions

that proper intervention by BMC care staff—including requesting a second opinion and using their chain of command to escalate Mr. Hernandez's condition for further assessment prior to discharge—would have, to a reasonable degree of medical probability, resulted in Mr. Hernandez recovering greater function than he ultimately achieved. Petitioners argue that the circuit court failed to consider this expert testimony, and all permissible inferences therefrom, in the light most favorable to petitioners as the nonmoving party.

BMC responds that petitioners failed to produce evidence to causally connect BMC care staff's alleged failure to escalate Mr. Hernandez's post-operative condition to his alleged damages. More specifically, BMC argues there is no evidence in the record establishing what the hospital's response would have been or that the treatment plan hypothesized by petitioners' experts would have been undertaken had BMC care staff escalated Mr. Hernandez's case in accordance with the hospital's policy.

West Virginia Code § 55-7B-3(a) provides the following elements of proof to support a medical malpractice cause of action:

> (1) The health care provider failed to exercise that degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances; and

> (2) Such failure was a proximate cause of the injury or death.

"The proximate cause of an injury is the last negligent act contributing to the injury and without which the injury would not have occurred." Syl. Pt. 1, *Mays v. Chang*, 213 W. Va.

220, 579 S.E.2d 561 (2003) (per curiam) (citation modified). In other words, proximate cause is understood to mean "that cause which in actual sequence, unbroken by any independent cause, produced the wrong complained of, without which the wrong would not have occurred." *Id.* at 224, 579 S.E.2d at 565 (quoting Syl. Pt. 3, *Webb v. Sessler*, 135 W. Va. 341, 63 S.E.2d 65 (1950)). To establish causation, the plaintiff need not show that the defendant's negligence was the *sole* proximate cause, only that it was *a* proximate cause. *Id.* at 224, 579 S.E.2d at 565. Moreover, in the specific context of a "loss of chance" theory,[4] "the plaintiff must also prove, to a reasonable degree of medical probability, that following the accepted standard of care would have resulted in a greater than twenty-five percent chance that the patient would have had an improved recovery." W. Va. Code § 55-7B-3(b).

Generally, causation in medical professional liability cases must be established by expert testimony. *See Dellinger v. Pediatrix Med. Grp., P.C.*, 232 W. Va. 115, 124-25, 750 S.E.2d 668, 677-78 (2013) (per curiam). An expert who testifies as to proximate causation "need only state the matter in terms of a reasonable probability." *Id.* at 117, 750 S.E.2d at 670, syl. pt. 5 (citation and quotations omitted). In *Pygman v. Helton*, the Supreme Court of Appeals of West Virginia ("SCAWV") clarified the rule of law with respect to expert testimony in medical malpractice cases:

---

[4] A "loss of chance" theory is the theory "that the health care provider's failure to follow the accepted standard of care deprived the patient of a chance of recovery or increased the risk of harm to the patient which was a substantial factor in bringing about the ultimate injury to the patient." W. Va. Code § 55-7B-3(b).

14

Medical testimony to be admissible and sufficient to warrant a finding by the jury of the proximate cause of an injury is not required to be based upon a reasonable certainty that the injury resulted from the negligence of the defendant. All that is required to render such testimony admissible and sufficient to carry it to the jury is that it should be of such character as would warrant a reasonable inference by the jury that the injury in question was caused by the negligent act or conduct of the defendant.

Syl. Pt. 1, *Pygman v. Helton*, 148 W. Va. 281, 134 S.E.2d 717 (1964). Notwithstanding, a nonmoving party cannot meet their burden in opposing summary judgment with "unsupported speculation." *Dellinger*, 232 W. Va. at 122, 750 S.E.2d at 675.

Petitioners contend that Drs. Ozuna and Gottesman's testimony creates a genuine issue of material fact as to proximate cause because they opined to a reasonable degree of medical probability that escalation through the chain of command and advocacy for a second opinion would have triggered a chain reaction, including proper medical assessment and treatment, that would have improved Mr. Hernandez's outcome. Significantly, BMC has not challenged the admissibility of these experts' opinions. BMC has not disputed the qualifications of Petitioners' experts, nor have they sought to exclude their opinions on the basis that they lack a factual basis or do not rise to the level of reasonable medical probability. Rather, BMC argues that the opinions of these experts do not create an issue of material fact because they rest on an uncertain chain of events or presuppose that escalation would have initiated the response and treatment hypothesized by these experts. We disagree.

15

Petitioners' experts' testimony on causation must be considered in light of their opinions that the standard of care dictated a response through the chain of command. Dr. Gottesman grounded his opinion in BMC's own written policies and procedures that expressly authorize BMC care staff to escalate clinical concerns to higher levels of authority, including physicians, through the chain of command. Relying on those policies and procedures, Dr. Gottesman opined that BMC care staff breached the standard of care by failing to initiate that process. He further testified that if BMC care staff had escalated Mr. Hernandez's case through the appropriate channels, it is more likely than not that this process would have triggered further clinical evaluation. Dr. Gottesman's description of this chain reaction is his expert opinion regarding how such escalation procedures are expected to function in hospital settings. Dr. Gottesman was not required to recite any "rigid incantation" or formulaic language in rendering this opinion. *Sexton v. Grieco*, 216 W. Va. 714, 720, 613 S.E.2d 81, 87 (2005) (per curiam) (citation omitted). It is sufficient that he opined to a reasonable degree of medical probability that escalation under the policies and procedures would have led to further assessment by a physician. *See* Syl. Pt. 3, *Hovermale v. Berkeley Springs Moose Lodge No. 1483*, 165 W. Va. 689, 271 S.E.2d 335 (1980) ("Where a physician is testifying as to the causal relation between a given physical condition and the defendant's negligent act, he need only state the matter in terms of a reasonable probability.").

Based on Dr. Gottesman's opinion, a jury could reasonably infer that escalation through the chain of command would have led to further clinical evaluation.

That inference is further supported when Dr. Gottesman's testimony is considered in conjunction with Dr. Ozuna's opinion regarding the standard of care of a physician presented with Mr. Hernandez's case. Dr. Ozuna testified that a physician was obligated under the standard of care to order an MRI, which would have led to a subsequent spinal decompression procedure. Dr. Ozuna also testified that the standard of care required this decompression procedure, and that this procedure would have resulted in a greater than twenty-five percent chance of an improved recovery. Like Dr. Gottesman, Dr. Ozuna did not speculate about an unknown physician's subjective approach to care but described what the standard of care required. This evidence, viewed in the light most favorable to petitioners, is sufficient to permit a rational jury to find that this chain reaction would have occurred, resulting in a better outcome for Mr. Hernandez. *See Est. of Fout-Iser ex rel. Fout-Iser v. Hahn*, 220 W. Va. 673, 679, 649 S.E.2d 246, 252 (2007) (finding that testimony of three experts was interconnected and, when read together, was sufficient to create a genuine issue of material fact). Accordingly, we find that the circuit court erred in finding that petitioners developed no evidence proving what, if anything, would have happened had BMC care staff escalated Mr. Hernandez's case through the chain of command. Indeed, that is precisely what the expert testimony concerns. Any alleged gaps or contingencies in the record go to the weight of the experts' testimony, not their sufficiency at the summary judgment stage.[5]

---

[5] This ruling does not foreclose BMC from seeking to exclude portions of petitioners' experts' testimony through appropriate pretrial motions. After resolving any such motion, the circuit court may revisit whether sufficient evidence exists to proceed to trial. Absent such a challenge, however, the court's role at the summary judgment stage is

BMC relies on the SCAWV's decision in *Dellinger*, 232 W. Va. 115, 750 S.E.2d 668, and this Court's decision in *Stoudt v. Eads*, 248 W. Va. 583, 889 S.E.2d 305 (Ct. App. 2023) for the notion that petitioners' experts' causation opinions are impermissibly speculative in the absence of evidence establishing that the expected chain reaction would have, in fact, occurred. Those cases are readily distinguishable. In *Dellinger*, the expert's opinions regarding breach of the standard of care and causation were conditioned upon the existence of facts that were unsupported by the record, namely, that the plaintiff's provider had access to lab results at a time when earlier intervention was allegedly required. 232 W. Va. at 122-25, 750 S.E.2d at 675-78. Significantly, the plaintiff's expert conceded that he could not establish when the provider received or should have received those results, and the plaintiff offered no evidence to fill that gap. *Id.* at 121, 750 S.E.2d at 674. As a result, the opinion was not merely questionable; it was wholly untethered from the facts in the record and, thus, speculative. *Id.* at 122, 750 S.E.2d at 675. By contrast, the opinions offered here are grounded in facts regarding Mr. Hernandez's post-operative condition, BMC's written policies and procedures, and the standards of care that required BMC's care staff to escalate, the hospital to communicate with a physician, and a physician to initiate an MRI. Unlike in *Dellinger*, petitioners' experts do not assume

not to weigh the credibility or reliability of expert opinions but to determine whether genuine issues of material fact exist under Rule 56.

missing facts. Rather, they opine to a reasonable degree of medical probability that escalation would have triggered this chain reaction.[6]

*Stoudt* is also distinguishable. There, the expert's testimony was insufficient because it failed to rise above the level of possibility and, critically, could not account for or exclude multiple, alternative causes of the plaintiff's symptoms. 248 W. Va. at 589, 889 S.E.2d at 311. The expert repeatedly characterized the alleged harm as only "potentially" related to a foreign object left in the plaintiff's abdomen and acknowledged the difficulty in determining causation given the plaintiff's medical history. *Id.* at 590, 889 S.E.2d at 312. In that context, the SCAWV concluded that the testimony would require the jury to speculate. *Id.* at 590-91, 889 S.E.2d at 312-13. Here, however, petitioners' experts do not suggest that escalation through the chain of command *might* have led to a subsequent MRI and third surgical decompression; they opine it, more likely than not, *would* have based on the required institutional and clinical responses under the applicable standards of care. Applying *Pygman*, this testimony is sufficient to create a reasonable inference as to causation for the jury's consideration. *See* 148 W. Va. at 281, 134 S.E.2d at 718, syl. pt. 1.

While not binding on this Court, our conclusion is consistent with the approach taken in other jurisdictions. For example, *Adventist Healthcare, Inc. v. Mattingly*, 223 A.3d 1025, 1032 (Md. Ct. Spec. App. 2020) involved a nurse who failed to activate a

---

[6] Additionally, unlike this case, in *Dellinger* the plaintiff did not rely on the "loss of chance" theory. *See* 232 W. Va. at 123 n.13, 750 S.E.2d at 676 n.13.

rapid response team regarding a patient's deteriorating condition after surgery. The plaintiff presented two expert opinions on causation: a nurse who testified that the nurse at issue was required to activate the rapid response team by 8:30 a.m. pursuant to the hospital's written chain of command policy; and a physician who testified that (1) the patient's condition was a surgical emergency requiring immediate operation, (2) the patient should have been taken for a new colostomy by 9:00 or 10:00 a.m., and (3) the patient would have survived had the surgery been performed by 10:00 a.m. *Id.* at 1039. Additionally, there was evidence that the chain of command policy required the rapid response team to respond to medical emergencies. *Id.* The court held that the jury could reasonably infer, based on the expert testimony and policy, that activation of the rapid response team by 8:30 a.m. would have resulted in surgery within the requisite time. *Id.* at 1040. Like *Adventist* where the jury could reasonably infer that escalation under the chain of command policy would have led to a timely colostomy, a jury could reasonably infer here, based on Drs. Ozuna and Gottesman's testimony, that the standard of care required the hospital to respond by communicating with a physician who would have ordered an MRI and initiated a third spinal decompression had escalation through the chain of command occurred. Such inferences would not require a jury to speculate but are supported by the opinions of medical experts.

Petitioners also argue that the circuit court usurped the fact-finding role of the jury by crediting the testimony of Mr. Hernandez's assigned medical team when the conflicting testimony of petitioners' causation experts created a genuine issue of material

20

fact. Petitioners argue that the circuit court's conclusion that, in light of the conflicting testimony of other witnesses, petitioners' experts engaged in speculation is a factual determination for the jury.[7] BMC counters that the circuit court did not weigh evidence but found that petitioners failed to produce evidence to support their experts' prediction of what would have occurred regarding Mr. Hernandez's plan of care had BMC care staff escalated his post-surgical condition up the chain of command. BMC argues that, in the absence of such evidence, petitioners did not meet their burden in opposing summary judgment.

The SCAWV has repeatedly emphasized that "[q]uestions of . . . proximate cause . . . present issues of fact for jury determination when the evidence pertaining to such issues is conflicting or where the facts, even though undisputed, are such that reasonable men may draw different conclusions from them." Syl. Pt. 7, *MacDonald v. City Hosp., Inc.*, 227 W. Va. 707, 715 S.E.2d 405 (2011) (quotation omitted). As such, "questions of proximate cause are often fact-based issues best resolved by a jury." *Stewart v. George*, 216 W. Va. 288, 293, 607 S.E.2d 394, 399 (2004) (per curiam).

---

[7] Dr. Yalamanchili testified that the goal of the surgical procedures was to prevent further injury; they were not expected to yield immediate improvement in Mr. Hernandez's neurological function and that any improvement could take up to a year. Dr. Juneja testified that he could have sought a second opinion but had no doubts about Dr. Yalamanchili's plan of care or explanation of Mr. Hernandez's post-operative condition. Dr. Kutlu similarly testified that he did not believe a second opinion regarding Mr. Hernandez's post-operative condition was warranted and, accordingly, did not seek one.

Here, the evidence regarding proximate cause is not one-sided. Although the assigned medical team testified that a second opinion was not necessary, this evidence is not exclusive considering the competing expert opinions offered by Drs. Ozuna and Gottesman. As stated above, a reasonable jury could conclude, based on Drs. Ozuna and Gottesman's testimony, that had escalation through the chain of command occurred, the hospital would have communicated with a physician who would have ordered an MRI and a subsequent spinal decompression prior to discharge, thereby improving Mr. Hernandez's condition. Alternatively, a reasonable jury could conclude that a physician would not have been contacted through the chain of command or would not have upended the treatment plan for Mr. Hernandez. These differing inferences as to whether BMC care staff's negligence proximately caused Mr. Hernandez's injury present questions of fact for the jury. *See MacDonald*, 227 W. Va. at 726-27, 715 S.E.2d at 424-25 (finding that proximate cause remained an issue of fact for the jury, despite treating physician's testimony that he would not have changed the course of treatment even if the pharmacy warned him regarding possible drug interactions in accordance with the standard of care). Accordingly, we find that the circuit court erred in resolving this factual dispute on summary judgment.

## IV.    CONCLUSION

For the foregoing reasons, we reverse the circuit court's March 12, 2025, order granting summary judgment in favor of BMC. As such, the circuit court's May 7, 2025, order denying petitioners' motion for reconsideration is vacated as moot. We remand this case to the circuit court for further proceedings consistent with this opinion.

22

Reversed and Remanded.